**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ASTRID G. ESTRADA, WENDY M. ESTRADA GUILFREDO E. MUNOZ, JOSE A. AQUINO, CRUZ F. RIVERA, CARLOS E. TAMUP, JOSE BURGOS, ABELINO M. URIZAR, ISRAEL TEBALAN, ROLANDO NORIEGA, BORIS R. CRUZ and ELSA HERNANDEZ VILA VICENCIO** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **C.A. No. 07-10ML** |
| **STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARÉ, individually and in his official capacity as Superintendent of the Rhode Island State Police, THOMAS CHABOT, individually and in his official capacity as a state trooper employed by the State of Rhode Island, JANE DOE, individually and in her official capacity as a state trooper employed by the State of Rhode Island** | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Now come the Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 12.1, and move for judgment as a matter of law. Defendants contend that based on the undisputed facts, they are entitled to summary judgment on all counts of Plaintiffs' Amended Complaint.

Wherefore, the Defendants pray that this Motion is granted and judgment enter dismissing this case.

Respectfully submitted

DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ James R. Lee

JAMES R. LEE (4305)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

/s/ Brenda D. Baum

BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

/s/ John M. Moreira

JOHN M. MOREIRA (7371)
Special Assistant Attorney General
R.I. Department of Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2411
Fax: (401) 222-3016
jmoreira@riag.ri.gov

**CERTIFICATION**

I hereby certify that I have electronically mailed the foregoing document on this 22nd day of May, 2008, to the attorney(s) of record listed below:

**V. Edward Formisano, Esquire**
edf@sfclaw.com

**/s/ John M. Moreira**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ASTRID G. ESTRADA, WENDY M. ESTRADA GUILFREDO E. MUNOZ, JOSE A. AQUINO, CRUZ F. RIVERA, CARLOS E. TAMUP, JOSE BURGOS, ABELINO M. URIZAR, ISRAEL TEBALAN, ROLANDO NORIEGA, BORIS R. CRUZ and ELSA HERNANDEZ VILA VICENCIO** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **C.A. No. 07-10ML** |
| **STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARÉ, individually and in his official capacity as Superintendent of the Rhode Island State Police, THOMAS CHABOT, individually and in his official capacity as a state trooper employed by the State of Rhode Island, JANE DOE, individually and in her official capacity as a state trooper employed by the State of Rhode Island** | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case is before the Court on Defendants' Motion for Summary Judgment. The Plaintiffs allege the following in their Complaint: (1) illegal search and seizure under 42 U.S.C. § 1983, and Article I, Section 6 of the Rhode Island Constitution; (2) unlawful discrimination under 42 U.S.C. §§ 1981,1983, Article I, Section 2 of the Rhode Island Constitution, and Rhode Island General Laws 31-21.2; and (3) a state tort claim of negligence. Plaintiffs' claims flow from the lawful stop of a van in which they traveled, on July 11, 2006, and their admissions to the officer who made the stop that they were all

in this country illegally. The Defendants submit that reasonable suspicion existed for the stop of the van, the continued detention of the Plaintiffs, and the escort of Plaintiffs to an office of Immigration and Customs Enforcement. Additionally, the pat downs of the driver, Plaintiff Tamup, were proper in the totality of the circumstances of the traffic stop. Defendants also submit that the application of the doctrine of qualified immunity defeats Plaintiffs' claims as a matter of law. Therefore, summary judgment is appropriate on all counts of the Complaint.

## II. STATEMENT OF FACTS

For purposes of this motion, the Court must assume that the facts related by Plaintiffs, although many are disputed by the Defendants, are true. However, any factual conflict between a Plaintiff's recitation and the videotape recording of the initial stop should be resolved in favor of what transpired in the videotape footage. See Scott v. Harris, __ U.S. __, 127 S.Ct. 1769, 1775-76 (2007) (court viewed facts disputed by plaintiff in § 1983 action in light depicted by videotape of incident).

On the morning of July 11, 2006, Carlos Tamup was driving a van containing thirteen coworkers; they were traveling south on Interstate 95 to work at Cimini Association in Westerly, Rhode Island. Exhibit A : Deposition of Carlos Tamup, pp. 8-9, 11 (hereinafter "Tamup Depo."); Exhibit B: Deposition of Astrid Estrada Cabrera, p. 8 (hereinafter "A. Cabrera Depo."); Exhibit C: Deposition of Wendy Cabrera, p. 7 (hereinafter "W. Cabrera Depo."); Exhibit D: Deposition of Jose Burgos, p. 8 (hereinafter "Burgos Depo"); Exhibit E: Deposition of Israel Tebalan, p. 8 (hereinafter "Tebalan Depo."); Exhibit F: Deposition of Jose Aquino, p. 7 (hereinafter "Aquino Depo."); Exhibit G: Deposition of Boris Cruz, p. 8 (hereinafter "Cruz Depo."); Exhibit H:

Deposition of Rolando Noriega, p. 10 (hereinafter "Noriega Depo"); Exhibit I: Deposition of Elsa VilaVicencio, p. 10 (hereinafter "Vila Vicencio Depo."); Exhibit J: Deposition of Guilfredo Munoz, p. 12 (hereinafter "Munoz Depo."). They worked polishing jewelry. Exhibit G: Cruz Depo., p. 9; Exhibit I: Noriega Depo., p. 10; Exhibit A : Tamup Depo., p. 8. Tamup was paid $30 a passenger per week to drive them to work. Exhibit B : A. Cabrera Depo., p. 32; Exhibit C: W. Cabrera Depo., p. 10; Exhibit E : Tebalan Depo., p. 24; Exhibit F : Aquino Depo., p. 7; Exhibit G: Cruz Depo., p. 18; Exhibit H: Noriega Depo., p. 12; Exhibit I: Vila Vicencio Depo., p. 11; Exhibit J: Munoz Depo., p. 23; Exhibit K: Deposition of Cruz Rivera, p. 15 (hereinafter "Rivera Depo.").

The passengers were seated in the van as follows: Guilfredo Munoz - front passenger seat; Jose Aquino and Boris Cruz – first row of seats of the van; Astrid Estrada Cabrera, Wendy Estrada Cabrera, Elsa Hernandez Vila Vicencio, Cruz Rivera, Abelino Urizar, and Jose Burgos – second and third row of seats; Israel Tebalan, Rolando Noriega – last row. Exhibit C: W. Cabrera Depo., p. 11;[1] Exhibit L: Deposition of Abelino Urizar, pp. 8-9 (hereinafter "Urizar Depo."); Exhibit E: Tebalan Depo., p. 10; Exhibit F: Aquino Depo., p. 10; Exhibit G: Cruz Depo., pp. 14-15; Exhibit H: Noriega Depo., p. 11; Exhibit I: Vila Vicencio Depo., pp. 13-15; Exhibit J: Munoz Depo., p. 22; Exhibit K: Rivera Depo, pp. 12-14.

Many of the occupants of the van were related. Wendy Cabrera and Astrid Cabrera are sisters. Exhibit C: W. Cabrera Depo., p. 7. Astrid Cabrera is married to Guilfredo Munoz. Exhibit B: A. Cabrera Depo., p. 5; Exhibit D: Burgos Depo., p. 24; Exhibit J: Munoz Depo., p. 5. Abelino Urizar and Rolando Noriega are cousins. Exhibit

---

[1] Astrid Cabrera indicated that she and these two other women were seated in the first row of seats. A. Cabrera Depo., pp. 14-15.

L: Urizar Depo., p. 6. Carlos Tamup is Israel Tebalan's uncle. Exhibit E: Tebalan Depo., p. 11. Jose Burgos and Boris Cruz are brother-in-laws. Exhibit G: Cruz Depo., pp. 7, 10.

Several of the passengers had a limited ability to understand English and virtually no ability to speak English. Exhibit J: Munoz Depo., p. 16; Exhibit G: Cruz Depo., pp. 9-10, 19-20, 23, 25; Exhibit H: Noriega Depo., pp. 8, 14, 18, 21, 22; Exhibit I: Vila Vicencio Depo., pp. 11-12, 29-31, 35, 37-38; Exhibit E: Tebalan Depo., pp. 7, 15, 22; Exhibit C: W. Cabrera Depo., p. 7; Exhibit F: Aquino Depo., p. 6; Exhibit B: A. Cabrera Depo., pp. 7-10, 13, 20, 22, 25, 27; Exhibit D: Burgos Depo., pp. 6-8; Exhibit L: Urizar Depo., p 6-7, 10. Tamup also acknowledged he understood "very little" English. Exhibit A: Tamup Depo., p. 10.

Rhode Island State Trooper Thomas Chabot had taken a post in his patrol car in the center median of Interstate 95 in Richmond, Rhode Island. Exhibit M: Deposition of Thomas Chabot, pp. 9-11 (hereinafter "Chabot Depo."); Exhibit N: Incident Report Narrative For Trooper Thomas Chabot (herinafter "Chabot Incident Report"). He had served as a member of the State Police since 2000. Exhibit M: Chabot Depo., p. 5. He had been on duty since 9:00 p.m., on July 10, 2006. Exhibit M: Chabot Depo., p. 9. He observed southbound traffic - near Exit 4. Exhibit M: Chabot Depo., pp. 9-11. Trooper Chabot observed Tamup change lanes on the highway without using his turn signal, a violation of R.I. Gen. Laws § 31-16-5, and conducted a motor vehicle stop. Exhibit A: Tamup Depo., p.11; Exhibit L: Urizar Depo., p. 10; Exhibit M: Chabot Depo., p. 10; Exhibit K: Rivera Depo., p. 15. All of the Plaintiffs acknowledge the validity of the

motor vehicle stop of the van. Exhibit O: Plaintiffs' Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 7.

Trooper Chabot approached the driver side of the van, and asked Tamup for his license, registration, and car insurance. Exhibit A: Tamup Depo., p. 11; Exhibit B: A. Cabrera Depo., pp. 17, 19-20; Exhibit C: W. Cabrera Depo., p. 12; Exhibit M: Chabot Depo., p. 12; Exhibit G: Cruz Depo., pp. 19-20; Exhibit H: Noriega Depo., p. 14; Exhibit I: Vila Vicencio Depo., p. 24; Exhibit J: Munoz Depo., p. 16, 23-24; Exhibit K: Rivera Depo., p.16. Tamup retrieved the documents from the front, center console. Exhibit A: Tamup Depo., pp. 11, 28; Exhibit C: W. Cabrera Depo., p. 15; Exhibit M: Chabot Depo., p. 14; Exhibit I: Vila Vicencio Depo., p. 20; Exhibit J: Munoz Depo., p. 39. Trooper Chabot told Tamup that he stopped him for not using his turn signal to change lanes. Exhibits P-1 and P-2: Videotaped with Enhanced Audio of Stop of Van Conducted on July 11, 2006 and Transcript of same (hereinafter "Video of Stop").

Trooper Chabot asked Tamup who owned the van, and Tamup replied that his wife did. Exhibit A: Tamup Depo., p. 16; Exhibit P1: Video of Stop. Tamup told the trooper that he and the passengers were going to work, in response to the trooper's question. Exhibit A: Tamup Depo., p. 16; Exhibit B: A. Cabrera Depo., p. 24; Exhibit M: Chabot, p. 16; Exhibit Q-11: Plaintiff Munoz Responses to Interrogatories Propounded by Defendant Trooper Thomas Chabot, Interrogatory Number 7. During this conversation, only the driver's window was open. Exhibit C: W. Cabrera Depo., p. 11, 21; Exhibit L: Urizar Depo., p. 10; Exhibit D: Burgos Depo., p. 13; Exhibit E: Tebalan Depo., p. 17; Exhibit H: Noriega Depo., p. 25.[2]

---

[2] Astrid Cabrera and Guilfredo Munoz testified that the window on the driver side of the first row was slightly open. Exhibit B: A. Cabrera Depo., p. 17; Exhibit J: Munoz Depo., p. 31.

Trooper Chabot then went to the passenger side of the van and opened the door. Exhibit A: Tamup Depo., p. 12; Exhibit G: Cruz Depo., pp. 22-23; see Exhibit P-1: Video of Stop. As he opened the door, a soccer ball fell out, and he placed it back in the van. Exhibit F: Aquino Depo., p. 12; Exhibit P-1: Video of Stop. Trooper Chabot asked the passengers for "ID's." Exhibit L: Urizar Depo., p. 14; Exhibit D: Burgos Depo., p. 9, 18; Exhibit F: Aquino Depo., p. 11; Exhibit M: Chabot Depo., p.12; Exhibit G: Cruz Depo., p. 24; Exhibit H: Noriega Depo., p. 18; Exhibit I: Vila Vicencio Depo., p. 21, 27, 29; Exhibit K: Rivera Depo., pp. 19-20; Exhibit P-1: Video of Stop. Trooper Chabot also "checked to see if everyone had seatbelts" fastened, and told the passengers that they had to wear them. Exhibit A: Tamup Depo., p. 16; Exhibit P-1: Video of Stop. Trooper Chabot counted the number of passengers in the van, and closed the side door. Exhibit L: Urizar Depo., p. 14; Exhibit P-1: Video of Stop. Some of the passengers became nervous. Exhibit D: Burgos Depo., p. 19; Exhibit C: W. Cabrera Depo., p. 17; Exhibit B: A. Cabrera Depo., p. 23; Exhibit A: Tamup Depo., p. 20-21; Exhibit J: Munoz Depo., pp. 17, 38.

Trooper Chabot approached the front seat passenger, later identified as Guilfredo E. Munoz, or "Willie," and asked for identification. Exhibit A: Tamup Depo., p. 12; Exhibit B: A. Cabrera Depo., pp. 17, 20; Exhibit G: Cruz Depo., p. 22; Exhibit I: Vila Vicencio Depo., p. 28; Exhibit J: Munoz Depo., pp. 12, 16, 27; Exhibit P-1: Video of Stop. Munoz said that he did not have any identification on him and that he had left it at home. Exhibit A: Tamup Depo., p. 12; Exhibit B: A. Cabrera, p. 21; Exhibit J: Munoz Depo., p. 16. Trooper Chabot asked him for his name and date of birth, and Munoz replied, "Willie Camay" and "6-7-77". Exhibit J: Munoz Depo., pp. 28-29; Exhibit P-1:

Video of Stop.[3] From the passenger side of the van, Trooper Chabot asked Tamup to translate for him in Spanish and requested identification from the other passengers. Exhibit A: Tamup Depo., pp. 13-14; Exhibit B: A. Cabrera Depo., pp. 18, 21; Exhibit C: W. Cabrera Depo., p. 12; Exhibit L: Urizar Depo., p. 14; Exhibit F: Aquino Depo., pp.11-12; Exhibit M: Chabot Depo., p. 13; Exhibit I: Vila Vicencio Depo. pp, 29, 36; Exhibit J: Munoz Depo., p. 17, 26, 30; Exhibit P-1: Video of Stop. Trooper Chabot then returned to his patrol car. Exhibit D: Burgos Depo., p. 12, 20; Exhibit H: Noriega Depo., p. 15; Exhibit I: Vila Vicencio Depo., p. 26; Exhibit J: Munoz Depo., p. 30; Exhibit P-1: Video of Stop.

Trooper Chabot conducted computer checks on Tamup's license and criminal history. Exhibit M: Chabot Depo., p. 25. These checks came back negative. He contacted an office of Immigration and Customs Enforcement (herinafter "ICE") in Vermont by telephone and conveyed that he stopped of van containing what appeared to be undocumented aliens. Exhibit M: Chabot Depo., p. 26; Exhibit N: Chabot Incident Report. He was informed that an agent from the Rhode Island office of ICE would contact him shortly. Id.

Upon the trooper's return to the van, Tamup informed him that only a few of the passengers had identification. Exhibit A: Tamup Depo., 13-14. From the passenger side door, Trooper Chabot collected forms of identification from some of the passengers. Exhibit A: Tamup Depo., p, 14; Exhibit C: W. Cabrera Depo., p. 17; Exhibit M: Chabot Depo., p. 21; Exhibit I: Vila Vicencio Depo., p. 29, 31; Exhibit K: Rivera Depo., pp. 20, 23. Israel Tebalan and Cruz Rivera provided identifications issued by the Guatemalan Consulate, and Rolando Noriega produced his non-driver's identification issued by the

[3] Munoz denied that the trooper asked for his date of birth. Exhibit J: Munoz Depo., p. 40.

Rhode Island Division of Motor Vehicles. Exhibit D: Burgos Depo., p. 18; Exhibit E: Tebalan Depo., p. 13; Exhibit F: Aquino Depo., p. 13; Exhibit B: A. Cabrera Depo., pp. 13-14; Exhibit G: Cruz Depo., p. 24; Exhibit H: Noriega Depo., p. 18; Exhibit J: Munoz Depo., p. 34; Exhibit K: Rivera Depo., p. 20. Astrid Cabrera told him that she left her identification at home. Exhibit B: A. Cabrera, pp. 21-22. When he received the consular identifications from the passengers, Trooper Chabot stated that those identifications were not valid, and some of the Plaintiffs allege that Trooper Chabot made a derogatory remark about the form of identification. Exhibit A: Tamup Depo., p. 15; Exhibit B: A. Cabrera Depo. pp. 10, 14; Exhibit C: W. Cabrera Depo., pp. 12-13, 18; Exhibit D: Burgos Depo., pp. 9, 18; Exhibit E: Tebalan Depo., pp. 15, 22; Exhibit H: Noriega Depo., p. 22; Exhibit J: Munoz Depo., pp. 17, 34; Exhibit K: Rivera Depo., p. 21.

Trooper Chabot also asked the passengers where they were headed and whether they possessed “any permission or license to be in this country” or “green cards.” Exhibit B: A. Cabrera Depo., pp. 18, 24, 25; Exhibit D: Burgos Depo., pp. 9, 18, 20; Exhibit E: Tebalan Depo., p. 22; Exhibit M: Chabot Depo., p. 22; Exhibit H: Noriega Depo., p. 19; Exhibit J: Munoz Depo., p. 33. Astrid Cabrera replied, “no,” and the other passengers either replied or gestured in the negative. Exhibit B: A. Cabrera Depo., p. 24; Exhibit H: Noriega Depo., pp. 21-22; Exhibit I: Vila Vicencio Depo., pp. 31; Exhibit J: Munoz Depo., p. 17.[4] A few of the Plaintiffs allege that the trooper was angered by their response. Exhibit D: Burgos Depo, pp. 9, 21-22; Exhibit H: Noriega Depo., pp. 20-21; Exhibit I: Vila Vicencio Depo., pp. 21, 31-32.

---

[4] The Plaintiffs’ accounts of their response to the question about “green cards” were internally inconsistent with each other. In contrast to the above recitations, two Plaintiffs recalled that no one responded to the trooper’s inquiry as to whether they had green cards. See Exhibit C: W. Cabrera Depo., p. 13, 18; Exhibit E: Tebalan Depo., p. 23 (no one other than Carlos spoke to the officer).

Trooper Chabot closed the passenger side door, and returned to the driver's side. Exhibit A: Tamup Depo., p. 16. Trooper Chabot asked Tamup to step out of the van, patted him down at the rear of the van, and spoke with him. Exhibit A: Tamup Depo., pp. 16, 18-19; Exhibit B: A. Cabrera Depo., p. 18; Exhibit C: W. Cabrera Depo., pp. 20-22; Exhibit L: Urizar Depo., p. 11; Exhibit D: Burgos Depo., p. 12; Exhibit H: Noriega Depo., pp. 15-16; Exhibit J: Munoz Depo., pp. 17, 30; Exhibit K: Rivera Depo., pp. 17-18.[5] Trooper Chabot mentioned that, if the passengers worked, they had to have green cards. Exhibit A: Tamup Depo., pp. 16, 17. Tamup told him that they did not have them. Id. When Tamup explained that he could not provide the trooper with such documentation, Trooper Chabot asked for his social security card and immigration documents. Tamup told him that he "didn't have it." Exhibit A: Tamup Depo., p. 17; Exhibit J: Munoz Depo., pp. 18, 36. Tamup returned to the driver's seat and was nervous because he did not have the requested documents. Exhibit A: Tamup Depo., pp. 19-20; Exhibit K: Rivera Depo., p. 18. Trooper Chabot returned to his patrol car. Exhibit A: Tamup Depo., pp. 19-20; Exhibit F: Aquino Depo., p. 13; Exhibit G: Cruz Depo., p. 26.

Inside the van, Tamup informed the passengers that the trooper had asked for green cards. Exhibit A: Tamup Depo., p. 19. "[T]here was already a panic about what was going to happen." Exhibit A: Tamup Depo., p. 20. In the meantime, two other police cars arrived at the scene. Exhibit A: Tamup Depo., p. 19; Exhibit B: A. Cabrera Depo., p. 18; Exhibit G: Cruz Depo., p. 25; Exhibit K: Rivera Depo., pp. 24-25.

A few minutes after his initial telephone call to ICE, Agent Cort Burke assigned to the Providence office of ICE contacted Trooper Chabot. Exhibit M: Chabot Depo., p.

---

[5] According to Burgos and Noriega, the trooper patted down Tamup and then the trooper came to passenger side door. Exhibit D: Burgos Depo., p. 21; Exhibit H: Noriega Depo., p. 17.

26; Exhibit N: Chabot Incident Report. Once Trooper Chabot related the situation before him, Agent Burke requested that Trooper Chabot detain the occupants of the van for further investigation by ICE. Exhibit R: Affidavit of Deportation Officer Cort Burke, dated May 20, 2008 (hereinafter "Burke Affidavit").

Trooper Chabot returned to the van and asked Tamup to step out of the van. Exhibit A: Tamup Depo., p. 19, 21; Exhibit L: Urizar Depo., p. 11; Exhibit J: Munoz Depo., pp. 18, 35. At the rear of the van, Trooper Chabot patted Tamup down again. Exhibit A: Tamup Depo., p. 21; Exhibit B: A. Cabrera Depo., p. 18, 26; Exhibit C: W. Cabrera Depo., p. 13, 20-22; Exhibit K: Rivera Depo., pp. 22-24. He told Tamup that it was Tamup's responsibility to take the van occupants to ICE because they did not have any immigration documentation. Exhibit A: Tamup Depo., p. 21; Exhibit B: A. Cabrera Depo., p. 18, 28; Exhibit C: W. Cabrera Depo. 13, 20-22. It is claimed that Trooper Chabot told Tamup to follow him to the ICE office in Providence, and that, if anyone tried to leave the van, "they could lose their life." Exhibit A: Tamup Depo., p. 22; Exhibit B: A. Cabrera Depo. p. 10, 12-13, 18, 27; Exhibit C: W. Cabrera Depo., pp. 13, 15, 19-22; Exhibit G: Cruz Depo., p. 27; Exhibit J: Munoz Depo., pp. 18, 37. Astrid Cabrera and Wendy Cabrera claim they heard the trooper state that, if anyone tried to get out of the van, he would shoot them. Exhibit B: A. Cabrera Depo., pp. 18, 27-30; Exhibit C: W. Cabrera Depo., pp. 13, 15, 24; Exhibit D: Burgos Depo., p. 14.[6] Once he was back in the van, Tamup testified that he conveyed the trooper's statements to the passengers in Spanish. Exhibit A: Tamup Depo., p. 23, 27; Exhibit B: A. Cabrera Depo., p. 27; Exhibit C: W. Cabrera Depo., p. 19; Exhibit L: Urizar Depo., pp. 11-12; Exhibit D: Burgos Depo., p. 15; Exhibit E: Tebalan Depo., p. 18; Exhibit F: Aquino Depo., p. 14;

[6] Trooper Chabot denies threatening anyone in the van. See Exhibit M: Chabot Depo., p. 32.

Exhibit G: Cruz Depo., pp. 21-22, 28, 31-32; Exhibit H: Noriega Depo., p. 24; Exhibit I: Vila Vicencio Depo., pp. 35-38; Exhibit J: Munoz Depo., p. 19; Exhibit K: Rivera Depo., pp. 26-27, 31.[7] Wendy Cabrera then related what Tamup had said to the passengers in the back of the van. Exhibit D: Burgos Depo., pp. 16-17, 24.[8]

Tamup followed behind Trooper Chabot's police vehicle, and Trooper Heather Donahue drove a patrol car behind the van. Exhibit A: Tamup Depo., p. 22; Exhibit M: Chabot Depo., pp. 32-33; Exhibit B: A. Cabrera Depo. p. 18; Exhibit C: W. Cabrera Depo., p. 14; Exhibit E: Tebalan Depo., p. 19; Exhibit H: Noriega Depo., pp. 22-23; Exhibit J: Munoz Depo., p. 19; Exhibit K: Rivera Depo., pp. 26, 28. In order to reverse direction on Interstate 95, Trooper Chabot led them off the highway at Exit 3. Exhibit F: Aquino Depo., p. 15; Exhibit C: W. Cabrera Depo., p. 14. They made a brief stop under an overpass, and Trooper Chabot checked the locks on the van doors. Exhibit A: Tamup Depo., p. 22; Exhibit B: A. Cabrera Depo., p. 19; Exhibit C: W. Cabrera Depo., p. 14; Exhibit L: Urizar Depo., p. 12; Exhibit D: Burgos Depo., p. 9; Exhibit E: Tebalan Depo., p. 19; Exhibit F: Aquino Depo., p.15; Exhibit G: Cruz Depo., p. 28; Exhibit H: Noriega Depo., p. 23; Exhibit J: Munoz Depo., pp. 19, 38-39; Exhibit K: Rivera Depo., pp. 26, 28-29.

---

[7] Trooper Chabot testified that the Tamup and the passengers voluntarily acceded to the request of ICE to respond the ICE office in Providence. Exhibit M : Chabot Depo., p. 31; Exhibit N: Chabot Incident Report, at p.2.

[8] The record is unclear whether Trooper Chabot conducted a third pat down of Tamup prior to departing the side of the road. Exhibit A: Tamup Depo., pp. 19, 21, 24 (trooper had him exit vehicle two or three times and patted him down at least once); Exhibit C: W. Cabrera Depo., p. 13, 20-22 (Tamup exited the van twice and patted him down once at rear of van); Exhibit B: A. Cabrera Depo. p.18 (trooper had Tamup exit the van "like to two or three times"); Exhibit M: Chabot Depo., p.22 (two pat downs of Tamup); Exhibit D: Burgos Depo., p. 9, 16 (Tamup exited and was patted down twice); Exhibit E: Tebalan Depo., p. 16, 19 (Tamup exited twice and patted down once); Exhibit F: Aquino Depo., p. 10 (Tamup exited two or three times); Exhibit I: Vila Vicencio Depo., p. 21 (Tamup exited twice); Exhibit J: Munoz Depo., p. 38 (Tamup exited twice).

Upon their arrival at the ICE office in Providence, Trooper Donahue stood outside the van on the passenger side. Exhibit D: Burgos Depo., p. 23; Exhibit J: Munoz Depo., p. 20. ICE agents escorted them into the building and detained them. Exhibit A: Tamup Depo., p. 25; Exhibit B: A. Cabrera, p. 31; Exhibit C: W. Cabrera Depo, pp. 22, 26; Exhibit L: Urizar Depo., p. 12; Exhibit E: Tebalan Depo., p. 20; Exhibit F: Aquino Depo., p. 16; Exhibit G: Cruz Depo, pp. 29-30; Exhibit H: Noriega Depo., p. 26; Exhibit J: Munoz Depo., p. 20; Exhibit K: Rivera Depo., pp. 31-32. Tamup received a ticket for changing lanes without signaling from Trooper Chabot at the ICE office. Exhibit S, Traffic Summons; Exhibit A: Tamup Depo., p. 29; Exhibit B: A. Cabrera Depo., p. 19, 31; Exhibit D: Burgos Depo., p 10. Tamup did not dispute the traffic ticket and paid the fine. Exhibit T: Certified Receipt of Payment of Summons, dated August 9, 2006.

## III. ARGUMENT

### A. Standard for Summary Judgment

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the [Civil] Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary judgment is lawful and proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[9] and that the moving party is entitled to judgment as a matter of law." R.I. Super. R. Civ. P. 56(c). In addition, "[s]ummary judgment is appropriate against a party who, after a sufficient time for discovery, 'fails to make a showing sufficient to establish

---

[9] "A fact is 'material' if it might affect the outcome of the suit' under the applicable legal standard. Flowers v. Fiore, 359 F.2d 24, 28 (1st Cir.2004)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, [1986]).

the existence of a single element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Torraco v. Maloney, 923 F.2d 231, 232 (1st Cir. 1991)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322).

According to Federal Rule 56(e):

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. (Emphasis added).

Based upon the foregoing, the United States Supreme Court observed that the above two sentences of Rule 56(e) were added "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings." Celotex Corp, 477 U.S. at 325. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249 (emphasis added). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (emphasis added). As the Court recognized:

> [n]or are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether where is any upon which a jury could properly proceed to find a verdict for the

> party producing it, upon whom the onus of proof is imposed. Id. at 251, (emphasis in original).

Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252 (emphasis added).

**B. The Plaintiffs' 42 U.S.C. § 1983 Claim against The State of Rhode Island, Colonel Steven M. Pare in his official capacity, and Trooper Thomas Chabot in his official capacity should be dismissed as none are "persons" within the meaning of the statute.**

In Counts Two and Three, Plaintiffs bring suit against the Defendants under 42 U.S.C. § 1983 seeking monetary damages and declaratory relief. The United States Supreme Court in Will v. Michigan Department of State Police, 491 U.S. 58, 62-70 (1989), ruled that a state is not a "person" within the meaning of 42 U.S.C. § 1983. Similarly, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and is "no different from a suit against the State itself." Will, 491 U.S. at 71. Thus, state officials named in their official capacity are not "persons" within the meaning of 42 U.S.C. §1983.

Therefore, Counts Two and Three against the State of Rhode Island, Colonel Pare in his official capacity, and Trooper Chabot in his official capacity must fail. See Will, 491 U.S. 58, 62-71; see also Jones v. State, 724 F.Supp. 25, 28 (D. R.I. 1989).

**C. The Plaintiffs' 42 U.S.C. §1983 Claims Against Trooper Thomas Chabot In His Individual Capacity Should Be Dismissed Because No Constitutional Violation Has Been Established And/Or On The Basis Of Qualified Immunity.**

Aside from a blanket statement in Count Two[10] of their Complaint, Plaintiffs do not identify the specific actions they allege violated their Fourth Amendment right to be free from unreasonable search and seizures. Through their answers to interrogatories, however, Plaintiffs appear to claim that their Fourth Amendment rights were violated on July 11, 2006, when:

> (1) Trooper Chabot asked the occupants of the van for identification and subsequently immigration documentation; (2) Trooper Chabot conducted three pat down frisks of Plaintiff Tamup; and (3) the troopers escorted the van to U.S. Immigration and Customs Enforcement in Providence.

See Exhibits O-1 through O-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 5; Exhibits U-1 through U-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant State of Rhode Island, Interrogatory Number 5; Exhibits Q-1 through Q-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant Trooper Thomas Chabot, Interrogatory Number 5; Exhibits V-1 through V-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 6.

[10] Count Two of the Complaint states: "Defendants, acting under color of state law, by their individual and concerted acts and/or omissions, including, but not limited to those described herein, caused Plaintiffs to be illegally searched and seized in derogation of Plaintiffs' constitutional right to be free from unreasonable searches and seizures, causing Plaintiffs to sustain damages as aforesaid, and thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to USC §1983."

**i. Qualified Immunity in 42 U.S.C. §1983 Cases**

For personal liability under 42 U.S.C. §1983 to attach, the law requires a "more particularized" showing than in other actions: namely, that "unlawfulness" under the Constitution be "apparent" based on preexisting law. Anderson v. Creighton, 483 U.S. 635, 640 (1987); Saucier v. Katz, 533 U.S. 194 (2001). The doctrine of qualified immunity provides an "escape hatch," Camilo-Robles v. Zapata, 175 F.3d 41 (1st Cir. 1999), precluding suits for money damages under § 1983 against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982). The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial – of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S. at 816. Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000) (citing Malley v. Briggs, 475 U.S. 335, 341, 343 [1986]).

Without proper immunity for reasonable *mis*interpretation, governmental actors would be placed in the untenable position of facing the burdens of litigation and the risk of liability for guessing incorrectly when the constitutional provision itself provides little guidance. The qualified immunity doctrine exists to protect objectively reasonable decisions from becoming an obstacle to the efficient functioning of state government. The Supreme Court has never held that all decisions made by government officials be correct in all respects—simply that they be objectively reasonable. Implicit in the idea

that officials have some immunity for their official acts is a recognition that they may err. The concept of immunity assumes this and goes on to recognize that it is better to risk some error and possible injury from such error than not to decide or act at all. See Scheuer v. Rhodes, 416 U.S. 232 (1974). The law has sought to provide a measure of deterrence against patent violations of recognized constitutional rights, while avoiding the kind of zealousness that would hamper effective decision-making by competent officers acting in a reasonable manner.

The doctrine of qualified immunity rests on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; and (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good. Scheuer v. Rhodes, 416 U.S. at 240.

In applying the qualified immunity defense to a claim brought under 42 U.S.C. § 1983, the First Circuit has used the following three-part test:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Jennings v. Jones, 499 F.3d 2, 16 (1st Cir. 2007).

Here, Plaintiffs have met the first step of the analysis in alleging a deprivation of their Fourth Amendment rights to be free from unreasonable searches and seizures. "[T]he court must 'proceed to determine whether the right was clearly established at the time of the alleged violation.'" Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir.2001)

(citations omitted). It is not enough for the constitutional right to be "clearly established" at a highly abstract level. Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998). For a right to be clearly established, the contours of the alleged right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. at 640. Courts "consider whether existing case law gave the defendants 'fair warning that their conduct violated the plaintiff's constitutional rights.'" Jennings, 499 F.3d 2, 16 (citations omitted). "The law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct' at issue." Jennings, 499 F.3d 2, 16.

It is only if the Court finds that a constitutional right was violated and that right was clearly established at the time, will the Court address the particular conduct in question. See Abreu-Guzman, 241 F.3d at 73. If the Court reaches this third step, then it analyzes the facts to determine whether an objectively reasonable officer would have understood that his conduct violated a clearly established constitutional right. Id. "In the best of circumstances, '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" Savard v. Rhode Island, 338 F.3d 23, 29 (1st Cir. 2003) (citing Bell v. Wolfish, 441 U.S. 520, 559 [1979]). "Indeed, the Supreme Court itself has acknowledged, in a qualified immunity case, 'the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment.'" Id. (citing Anderson, 483 U.S. at 644). "The law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to

anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." Id. at 30.

Under this analytical framework, qualified immunity bars Plaintiffs' search and seizure claims. As shown more fully below, Plaintiffs have failed to establish a violation of clearly established constitutional rights – namely that Trooper Chabot lacked reasonable suspicion to detain Plaintiffs throughout the encounter and to conduct pat downs of Tamup. Moreover, the troopers' actions were objectively reasonable based on the facts, as they developed, at the time of the stop, on July 11, 2006.

Assuming arguendo that the trooper lacked reasonable suspicion to further detain the Plaintiffs, see infra, Trooper Chabot remains protected by qualified immunity. Trooper Chabot properly relied on the request of Immigration and Customs Enforcement to detain Plaintiffs. See Liu v. Phillips, 234 F.3d 55 (1st Cir. 2000) (finding qualified immunity for local police officer where he made reasonable decision to comply with request of Immigration agent for assistance in a mistaken arrest for immigration violations); see also 8 C.F.R. § 287.7(d) (authorizing temporary detention of up to 48 hours by state law enforcement agencies upon request of Department of Homeland Security). Even if Trooper Chabot misunderstood federal immigration law in some manner, his actions to facilitate a further investigation by ICE at ICE's request were objectively reasonable, and, therefore, entitled to qualified immunity. Id. at 58. Consequently, Plaintiffs' Complaint should be denied and dismissed.

**ii. Trooper Chabot's Actions Were Lawful**

This Complaint against Trooper Chabot should be denied and dismissed because Plaintiffs have failed to allege any actions or omissions by Trooper Chabot that support a

search or seizure claim under the Fourth Amendment. The undisputed facts of this case demonstrate that Trooper Chabot had reasonable suspicion to stop and to continue to detain Plaintiffs. The undisputed facts also show that his actions, including the pat downs of Plaintiff Tamup, fell within the reasonable scope of the investigative detention.

Trooper Chabot's contact with the Plaintiffs from the inception of the traffic stop to the conclusion at the ICE office was lawful. It is uncontested that Trooper Chabot made a valid traffic stop of the van. Trooper Chabot's questions of the driver and passengers regarding identification fell within the permissible bounds of the stop. His further questioning into their immigration status was a graduated response to emerging facts. The totality of circumstances of the stop, including the occupants' responses, provided supplemental suspicion of violations of federal immigration law to justify Trooper Chabot's further inquiry and detention. Wherefore, Trooper Chabot's motion for summary judgment should be granted as a matter of law.

***(a) Detention and Inquiry of Occupants of Van***

Trooper Chabot's actions were justified at their inception. A traffic stop constitutes a Terry stop, also referred to as an investigative stop, which is encompassed within the Fourth Amendment framework of police and citizen encounters. See United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998). It is well established that traffic violations constitute criminal conduct and provide sufficient reasonable suspicion to stop the vehicle and detain the driver. See Chhien, 266 F.3d 1, 6 (initial detention was legitimate where motorist was tailgating and operating an automobile equipped with blue-tinted lights); see also United States v. Bizier, 111 F.3d 214, 218 (1st Cir. 1997); United States v. Soares, 451 F.Supp.2d 282,

286 (D.Mass.2006) (police stop of car was valid because the car was driving without headlights and had dysfunctional taillights). All occupants of a vehicle are likewise subjected to a seizure, when a police officer effects an investigative stop of a vehicle. See Brendlin v. California, 551 U.S. __, 127 S.Ct. 2400, 2406-07 (2007); Whren v. United States, 517 U.S. 806, 808-10 (1996); Sowers, 136 F.3d 24, 27.

Here, Trooper Chabot observed Plaintiff Tamup commit a traffic violation by changing lanes without using his turn signal. See R.I. Gen. Laws § 31-16-5. See Exhbit A: Tamup Depo., p. 11; Exhibit M: Chabot Depo., p. 10. Therefore, it is beyond dispute that Trooper Chabot's initial stop of the van for a traffic violations was justified. See Exhibits O-1 through O-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 7.

Plaintiffs first allege that Trooper Chabot's questions and requests for identification violated their Fourth Amendment rights. See Exhibits Q-1 through Q-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant Trooper Thomas Chabot, Interrogatory Number 5; Exhibit V-1 through V-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 6; Exhibit D: Burgos Depo., p. 25. This argument is misplaced. Trooper Chabot briefly investigated the van and its occupants within the permissible bounds of the investigative stop. "To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau - the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed."

Chhien, 266 F.3d 1, 6; see also United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004). In determining whether the permissible bounds of an investigative stop have been overstepped, courts weigh "the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety." United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987) (internal citations omitted).

When a police officer starts a conversation with an individual and asks questions, this does not constitute a seizure. See Muehler v. Mena, 544 U.S. 93, 101 (2005); United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005). "In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 186 (2004)(arrest of Terry suspect for refusal to identify himself in violation of state "stop and identify" statute was constitutionally valid). "[I]nterrogation relating to one's identity or request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." INS v. Delgado, 466 U.S. 210, 216 (1984). "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification, and request consent to search his or her luggage." Muehler, 544 U.S. 93, 101 (quoting Florida v. Bostick, 501 U.S. 429, 434-35 [1991]). Thus, an officer's request for an individual's identification is a minimally intrusive measure.

In the context of investigative stops, it is well established that an officer may ask an individual to identify himself. See Hiibel, 542 U.S. 177, 186. "[Q]uestions concerning a suspect's identity are a routine and accepted part of many Terry stops." Id. Obtaining an individual's name during the course of an investigative stop serves

important government interests. Id. Knowledge of identity not only assists in bringing offenders to justice but may allay any concerns an officer has regarding a detained individual. Id.; United States v. Soriano-Jarquin, 492 F.3d 495, 501 (4th Cir. 2007).

In the context of an ongoing traffic stop, an officer has wide discretion to conduct a reasonable investigation of the vehicle and its occupants. See Maryland v. Wilson, 519 U.S. 408, 414 (1997) (officer making a traffic stop may order passengers out of the car pending completion of the stop); United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007). A reasonable investigation includes asking for the driver's license, registration, and insurance, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. See Sowers, 136 F.3d 24, 27; United States v. Givan, 320 F.3d 452, 459 (3rd Cir. 2003); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); United States v. White, 81 F.3d 775 (8th Cir. 1996); United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988). Thus, it is beyond dispute that Trooper Chabot's request for Plaintiff Tamup's license and registration was proper.

The passengers' constitutional rights were likewise not violated by Trooper Chabot's requests for their identification. The Fourth Amendment requires that the detention of passengers during a traffic stop be reasonable under the circumstances. See Whren, 517 U.S. at 808-10; Sowers, 136 F.3d at 27. It does not prohibit an officer from requesting information from the passengers, due to the fact that passengers present a risk to officer safety equal to the risk presented by the driver. See Wilson, 519 U.S. 408, 414 ("danger to an officer in a traffic stop is likely to be greater where there are passengers in addition to the driver in the stopped car."); Sowers, 136 F.3d 24, 27; Brigham, 382 F.3d

500, 506; United States v. Ward, 484 F.3d 1059 (8th Cir. 2007); Rice, 483 F.3d 1079, 1084. As the Fourth Circuit reasoned, if an officer may as a matter of course order passengers out of a vehicle, Wilson, 519 U.S. 408, "he may surely take the minimally intrusive step of requesting passenger identification." Soriano-Jarquin, 492 F.3d 495, 501. Similar to the driver, while a traffic stop is ongoing, an officer may request a passenger's identification, run background checks, and ask about travel plans. See Rice, 483 F.3d 1079, 1084; Brigham, 382 F.3d 500, 506; Ward, 484 F.3d 1059, 1061; United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001); Soriano-Jarquin, 492 F.3d 495, 500. Thus, here, Trooper Chabot's requests for identification from the thirteen passengers were within the permissible scope of the traffic stop.

Plaintiffs apparently next allege that after the license and criminal record check of Tamup, Trooper Chabot's continued detention violated the Fourth Amendment. See Exhibit A: Tamup Depo., p. 19; Exhibit M: Chabot Depo., p. 24; Exhibits V-1 through V-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 6. Plaintiffs' argument fails because the Fourth Amendment did not foreclose the state trooper from completing his inquiry regarding the Plaintiffs' identity, which had been complicated by a language barrier. As discussed supra, Trooper Chabot's request for identification from the passengers was within the scope of the traffic stop. Equally within the legitimate scope of the stop would have been time consuming criminal history checks of all thirteen passengers. See Rice, 483 F.3d 1079, 1084. However, most of the passengers were unable to even provide identification. With thirteen passengers, only three were able to produce identification cards (Israel Tebalan, Cruz Rivera, Rolando Noriega). Trooper

Chabot properly asked follow-up questions to determine who the other individuals were. See e.g. Sowers, 136 F.3d 24 (after passenger could not produce some form of identification in response to trooper's request, trooper attempted to verify passenger's identity and questioned her about extent, purpose, and details of travel); Brigham, 382 F.3d 500, 507 (where some passengers did not provide valid identification in a traffic stop, Fourth Amendment did not require that trooper end his investigation to determine their true identity). The occupants' overall responses or lack thereof naturally and appropriately led to a deeper inquiry. See United States v. Morgan, 270 F.3d 625 (8th Cir. 2001) (Based on observations and responses by occupants of vehicle, an officer's suspicions may be raised to justify expanding the scope of the stop and asking additional, more intrusive questions).

Trooper Chabot's inquiry into the Plaintiffs' immigration status was permissible as the stop and the trooper's suspicion progressed. See generally Sowers, 136 F.3d 24, 27. "[W]hile an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Chhien, 266 F.3d at 6. However, no additional Fourth Amendment justification to inquire into immigration status was required, while the Plaintiffs were detained in the course of the traffic stop. See Muehler v. Mena, 544 U.S. 93, 101 (officers did not need additional Fourth Amendment justification for asking individual her name, date and place of birth, and immigration status while detained during the execution of a search warrant); Rice, 483 F.3d 1079, 1084 (requesting identification from passenger, running background check, removing

him from car fully justified by traffic violation and need not be supported by additional reasonable suspicion).

In any event, Trooper Chabot's suspicions mounted as he encountered a van full of fourteen individuals, whom he was told were traveling to work. As the situation unfolded, at least nine remained completely unidentified individuals and two at most, Tamup and Noreiga, were able to provide a form of identification issued by the federal or state government. Plaintiff Astrid Cabrera testified that she and all the others in the van then acknowledged that they were illegally in the United States. See Exhibit B: A. Cabrera Depo., p. 24. As a result, the Plaintiffs' responses "raised rather than lowered the level of suspicion, inviting further inquiry." United States v. Quinn, 815 F.2d 153, 158 (1st Cir. 1987).

Viewed incrementally subsequent to the request for the passengers' identification, the trooper's suspicions evolved into reasonable suspicion of federal immigration violations. While the trooper checked Tamup's credentials in processing the traffic violation, his suspicions simultaneously developed regarding potential violations of federal immigration law by the occupants of the van. See Exhibit M: Chabot Depo., p. 25. And, this shift in his focus was permissible. See Sowers, 136 F.3d 24, 27 ("[S]hift in [trooper's] focus is neither unusual or impermissible."); Chhien, 266 F.3d at 6.

As such, Trooper Chabot properly asked questions regarding the Plaintiffs' immigration status under these circumstances. See United States v. Rodriguez-Arreola, 270 F.3d 611, 617 (8th Cir. 2001) (Once driver told state trooper that passenger was not legally present in the United States, trooper had reasonable suspicion to inquire into passenger's alienage). With his suspicions raised, he contacted ICE for guidance at the

outset. That the actual inquiry of Plaintiffs occurred only upon a subsequent visit to the van shows a progression in his level of inquiry, and, therefore, was all the more reasonable. Exhibit H: Noriega Depo., p. 15; Exhibit I: Vila Vicencio Depo., p. 26; Exhibit M: Chabot Depo., pp. 21-22; Exhibit P-1: Video of Stop. [11] See Chhien, 266 F.3d at 6; United States v. Santana-Garcia, 264 F.3d 1188 (10th Cir. 2001) (state trooper's extended detention during car stop, based on suspicion of violations of federal immigration law and traffic law, was valid).

Trooper Chabot's actions in inquiring about Plaintiffs' immigration status did not unreasonably prolong the stop in these circumstances. The Supreme Court's and First Circuit's insistence on reasonableness, rather than proscriptions for police conduct, under the Fourth Amendment undermines any argument that the stop was unreasonably prolonged. See Ohio v. Robinette, 519 U.S. 33, 39 (1996) (the "touchstone of Fourth Amendment analysis is reasonableness."); McCarthy, 77 F.3d 522, 529 (relevant question is "whether actions taken were reasonable under the circumstances"). The lawfulness of police action during an investigative stop turns on "whether the actions undertaken by the officer following the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." Sowers, 136 F.3d 24, 27. Courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted).

[11] The videotape of the initial encounter indicates that no inquiry into immigration status occurred in that part of the encounter. Exhibit P-1: Video of Stop. Thus, it is an inescapable inference that the inquiry occurred during Trooper Chabot's subsequent visit to the van.

A subsequent visit to the van was necessary to complete the processing of the traffic violation. With Trooper Chabot back at the van anyway, it took only a brief amount of time to inquire into the immigration status of the passengers. See Chhien, 266 F.3d at 10. Thus, the inquiry did not unreasonably prolong the stop. See Sowers, 136 F.3d at 28 (state trooper had adequate justification to prolong stop beyond the point at which driver produced papers and passenger's identity was nominally corroborated); Chhien, 266 F.3d at 9 (officer's additional questions, which were unrelated to violation that justified the traffic stop, were justified based on his heightened suspicion).

Trooper Chabot's suspicions were heightened in his subsequent visits to the van. In his visit to the van, Trooper Chabot was not provided with any further identifying information or documentation. Instead, he discovered that many of the occupants lacked identification and, most importantly, was even informed of the occupants' undocumented status. See Exhibit B: A. Cabrera Depo., p. 24; Exhibit H: Noriega Depo., p. 21; Exhibit I: Vila Vicencio Depo., pp. 31, 33; Exhibit J: Munoz Depo., p. 17; Exhibit A: Tamup Depo., p. 17.

Trooper Chabot's suspicions of the occupants of the van evolved into reasonable suspicion of violations of federal immigration law. Reasonable suspicion requires more than a naked hunch that a particular person may be engaged in some illicit activity, but does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime. See Chhien, 266 F.3d at 6.

Federal immigration statutes became implicated in the encounter. The crime of entering the United States without being inspected by an immigration officer is a misdemeanor under federal law. See 8 U.S.C. § 1325. It is also a federal crime to

transport or harbor an individual known to be unlawfully present in the United States. See 8 U.S.C. § 1324(a)(1)(A)(ii) and (iii); see also 8 U.S.C. 1304(e) (failure to carry one's resident alien registration card subject to criminal penalties); 8 U.S.C. 1326 (crime of illegal re-entry of undocumented alien). Notably, federal law has empowered state law enforcement agencies to participate in the process of enforcing these laws. See 8 U.S.C. § 1357(g)(10)(b) (inviting state officers "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States").

The facts and circumstances known to Trooper Chabot at this juncture established reasonable suspicion of violations of these federal immigration laws. Plaintiffs Astrid Estrada, Plaintiff Tamup, and several other Plaintiffs revealed that the occupants' were undocumented aliens. These statements were very important; they essentially constituted a collective admission of the crime of entry without inspection. See 8 U.S.C. § 1325. Additionally, aside from Plaintiff Noriega's non-driver's license, the only identifications provided by the passengers were consular identifications. See Exhibit M: Chabot Depo., p. 21; Exhibit N: Chabot Incident Report; Exhibit E: Tebalan Depo., p. 13; Exhibit K: Rivera Depo., pp. 22-23; Exhibit F: Aquino Depo., p. 13; Exhibit B: A. Cabrera Depo., pp. 13-14; Exhibit H: Noriega Depo., p. 18; Exhibit J: Munoz Depo., p. 34. Not one occupants of the van provided resident alien registration cards and ten provided no identification at all. This production of non-government issued forms of identification by some and the inability of many of the passengers to provide any information regarding their identity gave rise to substantial suspicion of immigration violations.

The Plaintiffs' demeanor and manner of travel also contributed to reasonable suspicion. The Plaintiffs were nervous and not exactly forthcoming in response to Trooper Chabot. The videotape of the initial encounter reveals that, when Trooper Chabot first requested identification from the passengers, they gave no meaningful response. See Exhibit P-1: Video of Stop. The sheer number of individuals traveling to work in a non-commercial vehicle also was a factor. In the totality of these circumstances, it was reasonable to infer that at least twelve of the passengers had committed the crime of entering and/or remaining in the United States without being examined by United States Immigration. See 8 U.S.C. § 1325. Reasonable suspicion also existed that Tamup was transporting or harboring passengers, whom he knew were unlawfully present in the United States. See 8 U.S.C. 1324. Therefore, the verbal admissions of undocumented status, the production of any identification from only four of the fourteen individuals, and the overall absence of any documentation of immigration status established reasonable suspicion that the Plaintiffs had committed these crimes.

***(b) Continued Detention for ICE***

The continued detention of Plaintiffs on Interstate 95 and the trip to the ICE office in Providence was based on reasonable suspicion and further supported by ICE's request to detain them. See Exhibits V-1 through V-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 6. In determining whether an investigative stop is unreasonably prolonged, the First Circuit has stated:

> [W]hether a particular investigatory stop is too long turns on a consideration of all relevant factors, including the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Moreover, a court should ask whether the police

> diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

McCarthy, 77 F.3d 522, 530 (internal quotations omitted). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing." McCarthy, 77 F.3d at 530 (quoting United States v. Sharpe, 470 U.S. 675, 686 [1985]). "[T]here is no talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure under the fourth amendment." Quinn, 815 F.2d 153, 157. In determining whether the duration of a detention is reasonable, the Court must take into account "whether the police diligently pursue[d] their investigation, or . . . unnecessarily prolonged [the] detention." Sharpe, 470 U.S. 675, 685.

Here, Trooper Chabot acted diligently to confirm or dispel his suspicions. During the traffic stop, his calls to ICE based on his suspicions were proper. See 8 U.S.C. § 1357(g)(10)(a); Soriano-Jarquin, 492 F.3d 495, 501 (once driver indicated passengers were illegal aliens, it was proper for trooper to contact ICE). A claim that the Fourth Amendment denied him the opportunity to do so defies logic. Early on in the encounter, Trooper Chabot contacted the law enforcement agency readily equipped to handle federal immigration violations. Within three minutes of his initial contact with ICE, an agent from the Providence office of ICE contacted Trooper Chabot. See Exhibit M: Chabot Depo., p. 26; Exhibit R: Burke Affidavit. Based on the information conveyed by Trooper Chabot, the agent requested that he detain the Plaintiffs for further investigation by ICE.

Troopers Chabot's escort of the van to Providence was consistent with the Fourth Amendment. A further detention in the vicinity of Exit 4 for ICE's arrival would have been permissible under the Fourth Amendment. See Soriano-Jarquin, 492 F.3d 495, 501 (ICE advised trooper to take van off interstate and await the arrival of ICE agents for an administrative Immigration inquiry); United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005) (after warrant check came back negative, prolonged stop of one hour to wait for Immigration agent was justified). Such a detention on the side of the Interstate immediately adjacent to vehicular traffic, however, posed a significant danger to the safety of the occupants of the van, as well as the trooper. Instead, the ultimate escort to the ICE office in Providence was equally permissible. It was safer than a continued detention of the side of the Interstate and may have even shortened the duration of the detention by bringing the occupants to ICE instead of waiting for ICE to arrive.

Most importantly, Trooper Chabot had the requisite suspicion to continue to detain Plaintiffs, and he acted diligently to dispel the suspicions that he, and now ICE, harbored. See McCarthy, 77 F.3d 522, 530. Indeed, no view of the evidence indicates that the state trooper unnecessarily prolonged the investigation. Id. at 531. He minimally detained the Plaintiffs to comply with ICE's request, and the detention was necessary for ICE to further assess the Plaintiffs' immigration status. Thus, Trooper Chabot's interaction with ICE and the escort of the van to Providence was reasonable, and "the circumstances justified the officers' overall handling of the situation." Flowers v. Fiore, 359 F.3d 24, 30; see Sowers, 136 F.3d at 27; United States v. Ramirez-Cubillas, 223 F.Supp.2d 1049 (D. Neb. 2002) (detention of driver and passengers after driver stated that passengers were not legally in US for less than one hour for arrival of INS agents did

not violate 4th Amendment); see also United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994) (one-hour period not unreasonable period to wait for a drug dog to verify officer's suspicion).

***(c) Pat Downs of Plaintiff Tamup***

Plaintiff Tamup alleges that he was improperly searched and seized when Trooper Chabot "brought [him] down from the van three times to pat [him] down." See Exhibit Q-2: Tamup's Response to Interrogatories Propounded by Defendant Trooper Thomas Chabot, Interrogatory Number 5.[12]

At the outset in terms of this allegation, the Plaintiffs, other than Tamup, do not have standing to challenge the pat down frisks of Tamup. "The pat-down search that a Terry stop entails is a search of the person." Sowers, 136 F.3d at 28. Thus, the Plaintiffs, who were not patted down, can not challenge the pat downs of Tamup. See Sowers, 136 F.3d 24, 28-29 (finding that driver could not challenge the pat down search of passenger); United States v. Rodriguez-Arreola, 270 F.3d 611, 616 (can not use violation of another's rights as basis for own Fourth Amendment challenge).

Trooper Chabot's pat down frisks of Tamup do not amount to a constitutional violation. "[A] pat-frisk for weapons is permissible where 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" See United States v. McCoy, 428 F.3d 38, 39 (1st Cir. 2005) (quoting United States v. Romain, 393 F.3d 63, 71 [1st Cir. 2004]). "[A] court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion." Id. In

[12] Tamup testified that he was unsure if he was asked to exit the vehicle three times, but recalled that he was patted down at least once. Exhibit A: Tamup Depo., pp. 19, 21, 24.

an investigatory detention, "officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures." Flowers v. Fiore, 359 F.3d 24, 30.

Factors to consider in assessing an officer's safety concerns include the number of suspects compared to the number of officers and the conduct and appearance of the suspects. See United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998); McCoy, 428 F.3d at 40. Indeed, "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." Maryland v. Wilson, 519 U.S. 408, 415 (1997).

During the extended detention of the van, see supra, pp. 20-29, the request to exit the van and pat downs of Tamup served legitimate law enforcement purposes. These actions enabled Trooper Chabot to further investigate potential violations of federal immigration law and subsequently comply with ICE's request to detain the Plaintiffs in a safe manner. The conversations at the rear of the van served the same purposes and involved a potentially volatile situation of fourteen individuals being asked to report to the ICE office.

Trooper Chabot's reasonable suspicion that Tamup was transporting undocumented aliens coupled with his overall uncertainty of the passengers and their travel posed safety concerns for Trooper Chabot. In addition to this suspicion of wrongdoing, the true nature of this early morning transport was questionable. See Lopez-Moreno, 420 F.3d 420, 431 (facts were consistent with view that driver was not a commercial driver offering a completely legitimate service). For instance, it was not entirely clear whether the passengers willingly traveled in the van. When Trooper Chabot asked Tamup about the passengers, Tamup acted hesitant and nervous. See

Exhibit P-1: Video of Stop. When Trooper Chabot spoke with the passengers, they also appeared nervous. Another reason for concern was his inability to obtain knowledge of the identity or criminal background of numerous passengers of the van. See Hiibel, 542 U.S. 177, 186 (knowledge of identity can dispel suspicions); Quinn, 815 F.2d 153, 157 (answers to questions raised rather than lowered suspicion). Any of these thirteen passengers could have been armed and provided a weapon to Tamup during this roadside stop. Upon each exit from the van, Tamup would have had access to any weapons. See Exhibit M: Chabot Depo., p. 23. To forego a pat down under these circumstances would have been imprudent. Thus, these safety concerns justified the pat downs of Tamup.

Trooper Chabot's actions were no more intrusive than necessary. Faced with substantial safety concerns, Trooper Chabot refrained from taking more intrusive measures, such as utilizing handcuffs or drawing a gun. See McCarthy, 77 F.3d at 532; see also Bell, 441 U.S. at 559 (court must consider manner in which intrusion is conducted). That Trooper Chabot kept Tamup apprised of the reasons for the detention lessened the intrusiveness of his actions. See McCarthy, 77 F.3d at 532. Within the first minute of the stop, Trooper Chabot told Tamup that he stopped him for changing lanes without a signal. And, nothing in the record indicates that he misled Tamup and the passengers or withheld any information regarding the trip to Providence. Thus, Trooper Chabot's requests to exit the van and pat downs of Tamup were constitutionally proper because they were conducted in a minimally intrusive manner.

In sum, Trooper Chabot's reasonable suspicion, the unknown identities of several members of a group that greatly outnumbered him, and the factors present at the time of the stop "made it objectively reasonable" for him to "feel concern for [his] safety and to

suspect that [Tamup] might be armed." Soares, 451 F.Supp.2d 282, 286. Thus, the pat downs of Tamup were reasonable and did not violate a clearly established Fourth Amendment right in these circumstances.

**D. The Plaintiffs Were Not Deprived of Constitutional Rights under 42 U.S.C. §§ 1981, 1983**

There is no evidence that Plaintiffs were discriminated against by Trooper Chabot because of their race. Thus, Defendants are entitled to judgment as a matter of law.

42 U.S.C . § 1981 prohibits intentional discrimination based on race. See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, (1982). 42 U.S.C.§1981(a) provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, license, and exaction of every kind, and to no other.

The First Circuit, among other courts of appeals, has "held that a misuse of governmental power motivated by racial animus comes squarely within the "equal benefit" and "like punishment" clauses of section 1981(a)." Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 348 (1st Cir. 1985). A claim of deprivation of equal protection rights may also be pursued under 42 U.S.C. § 1983. Such a claim requires proof that Trooper Chabot exercised his discretion to enforce the traffic laws on account of the Plaintiffs' race. See Johnson v. Crooks, 326 F.3d 995, 999 (8th Cir.2003). Plaintiffs must prove both discriminatory effect and discriminatory purpose. See Johnson, 326 F.3d at 999; see also Hudson v. Teamsters Local Union, 536 F.Supp. 1138

(S.D.Ohio 1982)(The plaintiff in a 42 U.S.C. § 1981 claim must allege and prove intentional discrimination on the basis of race.)

To prevail on an equal protection claim, a plaintiff must present evidence that he was treated differently from similarly situated non-members of a particular protected class and that the action taken against him was motivated, at least in part, by his race. See Flowers v. Fiore, 359 F.3d 24, 35.

Plaintiffs' claim that Defendants "caused Plaintiffs to be illegally searched and seized and unlawfully discriminated against in derogation of Plaintiffs' constitutional right to be free from unlawful racial discrimination . . . ." Plaintiffs' Complaint, at ¶ 49; see also Plaintiffs' Complaint at ¶ 48. Plaintiffs further assert that "Trooper Thomas Chabot did perform a pat down of Plaintiff Tamup and sought identification from the passengers of the van after observing that they were Hispanic and that many of them did not speak English." Exhibits W-1 through W-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Trooper Thomas Chabot, Interrogatory Number 11. There is no evidence to support these blanket and baseless assertions by Plaintiffs. As to the initial stop, nothing in the record indicates that Trooper Chabot was aware of the race of any of the Plaintiffs at the time of the stop or that there were even passengers in the van. See Exhibit M: Chabot Depo., p. 12. Indeed, Plaintiffs do not challenge the initial stop. See Exhibits O-1 through O-12: Plaintiffs' Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 7.

As to the requests for identification from the passengers and the pat downs of Tamup during the traffic stop, no evidence of unlawful discrimination by the trooper has

been shown. Even if Plaintiffs' testimony has created an issue of fact as to the requirement of discriminatory intent, granting defendants' summary judgment motion is appropriate because Plaintiffs have proffered no evidence – anecdotal or statistical - of the second requirement of discriminatory effect. See Flowers v. Fiore, 359 F.3d 24, 34-35; Chavez v. Illinois State Police, 251 F.3d 612, 636 (7th Cir. 2001); Jeannite v. City of Haverhill, 2006 WL 1806410 (D.Mass. 2006);

Specifically, it has not been shown that the Plaintiffs were treated any differently from similarly situated non-Hispanic drivers and passengers in the course of a motor vehicle stop. See Flowers v. Fiore, 359 F.3d 24, 34-35; see also Jeannite v. City of Haverhill, 2006 WL 1806410 (D.Mass. 2006). There is no evidence that Trooper Chabot does not request identification from non-Hispanic passengers in similar circumstances. In fact, the record indicates to the contrary - Trooper Chabot's standard practice is to request identification from the driver and passengers in each vehicle he has stopped regardless of race. See Exhibit M: Chabot Depo., p. 18. No evidence has been presented that shows that the trooper detained the Plaintiffs or patted down Plaintiff Tamup based on anything other than reasonable suspicion. The mere fact of a difference in race between the person stopped and the officers does not establish a prima facie case of race discrimination. See Johnson, 326 F.3d at 999 (citing Ford v. Wilson, 90 F.3d 245, 248-49 [7th Cir.1997]). With only conclusory allegations of differential treatment, Plaintiffs have failed to state a discrimination claim under 42 U.S.C. §§ 1981 and 1983. Therefore, Counts Three and Four should be denied and dismissed.

**E. State Claims**

The existence of reasonable suspicion and the application of qualified immunity

defeat Plaintiffs' state claims. Wherefore, Counts One, Five, Six and Seven should be dismissed.

Defendants submit that qualified immunity is a bar to Plaintiffs' state claims. The First Circuit in Hatch v. Town of Middletown, et al., 311 F.3d 83 (1st Cir.2002) ruled that qualified immunity was available to state officers defending claims under Rhode Island law, despite there being no decision from the Rhode Island Supreme Court on point. The Hatch Court based its decision on the Rhode Island Supreme Court's decisions in Pontbriand v. Sundlun, 699 A.2d 856 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687 (R.I. 1997).

Plaintiffs' claim at Count Six that their rights to be free from unwarranted search and seizures provided to them, by Article I, Section 6 of the Rhode Island Constitution, were violated. First, Plaintiffs do not have a remedy under the Rhode Island Constitution where Plaintiffs have sought to pursue their Fourth Amendment allegations under the federal provisions. See Folan v. State/Department of Children, Youth & Families, 723 A.2d 287, 292 (R.I. 1999). Secondly, these claims are based on the same set of facts and theories asserted by Plaintiffs under federal law. Defendants submit that for the reasons previously set forth in response to the federal claims, their stop, search and seizure of Plaintiffs were all supported by reasonable suspicion thereby defeating this claim. Moreover, Trooper Chabot acted as any objectively reasonable officer would have done under the same circumstances and, as such, is entitled to qualified immunity as a bar to this claim. Wherefore, Defendants pray that Count Six is denied and dismissed.

In Counts Five and Seven, Plaintiffs have brought their discrimination and racial profiling claims also under state law. Defendants incorporate by reference their

arguments made in response to the federal discrimination and profiling claims (see supra, Section D). Additionally, as to Count Five, Plaintiffs do not have a remedy under the Rhode Island Constitution, since they have pursued these discrimination allegations under federal provisions. See Folan, 723 A.2d 287, 292. Therefore, this Court should deny and dismiss Counts Five and Seven.

In Count One of their Complaint, Plaintiffs assert a general claim of negligence against Defendants, however, they do not state with any specificity what acts or omissions they claim support this claim.[13] Plaintiffs have failed to establish any negligence in the selection, training, supervision and discipline of Trooper Chabot relative to the events of July 11, 2006, or the "proper manner in which to effectuate a lawful search, seizure, detention, and motor vehicle stop." Plaintiffs' Complaint at ¶¶ 39-41; Exhibits V-1 through V-12: Plaintiffs' Supplemental Responses to Interrogatories Propounded by Defendant Superintendent Steven M. Pare, Interrogatory Number 6. See Maldanado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-583 (1st Cir. 1994). Moreover, Plaintiffs' have failed to set forth any evidence that would support a claim against the State of Rhode Island on a theory of respondeat superior. See Plaintiffs' Complaint at ¶ 41; Exhibit G: Cruz Depo., p. 33; Exhibit I: Vila Vicencio Depo., p. 45; Exhibit F: Aquino Depo., p. 18; Exhibit B: A. Cabrera Depo., p. 33; Exhibit D: Burgos Depo., p. 25. See Gaudreault v. Municipality of Salem, Mass, 923 F.2d 203, 209 (1st Cir. 1990). Lastly, any such claim of negligence would fail as: (1) Troopers Chabot's actions were supported by reasonable suspicion; and (2) objectively reasonable officers would have

[13] Count One provides: "Defendants, by their individual and concerted actions and/or omissions, including but not limited to, those described herein, breached the duty of care owed to Plaintiffs thereby causing Plaintiff to sustain reasonably foreseeable harm and damages as aforesaid."

responded the same and, therefore is entitled to qualified immunity. Therefore, Count One should be dismissed.

**F. Plaintiffs' Own Illegal and Superceding Acts, for which Defendants Are Not Responsible, Caused Their Injuries**

Plaintiffs committed violations of federal immigration law prior to the Defendants' complained of acts. See Exhibit R: Burke Affidavit. Plaintiffs' acts thereby prevent any causal connection from the Defendants' alleged acts to Plaintiffs' injuries in any count of the Complaint. "A plaintiff should be compensated for all his damages of which the defendants' negligence was the proximate cause, but no claim for damages should be allowed to stand where such claim is not supported by the required degree of proof, or is speculative, or imaginary, or is clearly attributable to other causes." Andrews v. Penna Charcoal Co., 179 A. 696 (R.I. 1935).

Plaintiffs allege that they "have suffered, and will continue to suffer, severe mental anguish, embarrassment, pain and suffering, deprivation of their civil rights, and other great harm." Plaintiffs' Complaint, at ¶ 44. According to Plaintiffs, their mental and emotional harm is based on the prospect of deportation due to their undocumented status. See Exhibit G: Cruz Depo., p. 35; Exhibit I: Vila Vicencio Depo., pp. 43-44; Exhibit J: Munoz Depo., p. 39; Exhibit C: W. Cabrera Depo., pp. 23-24; Exhibit B: A. Cabrera Depo., pp. 37-38.[14] Plaintiffs can not dispute that the reason they face deportation proceedings is their status as undocumented aliens. None of the actions by the troopers contributed to this undocumented status. Had the Plaintiffs been documented aliens, no danger would have existed alone in Trooper Chabot contacting

[14] Astrid Cabrera testified that the cause of her nervousness is deportation for sitting in a passenger van. See Exhibit B: A. Cabrera Depo., p. 38. Wendy Cabrera testified that, in addition to the pending deportation proceedings, she was nervous from the alleged threat made by the trooper. See Exhibit C: W. Cabrera Depo., p. 24.

ICE. That Trooper Chabot shared his suspicion of the Plaintiffs' immigration status with ICE and escorted them to ICE does not connect a chain of legal causation to the Plaintiffs' injuries. Plaintiffs' mental and emotional injuries are clearly attributable to their own prior violations of federal immigration law. See Andrews, 179 A. 696 (finding that substantial amount of medical expenses for suffering and nervous condition were attributable to a prior condition and not accident). Thus, any of the alleged acts or omissions of the Defendants were not the proximate cause of Plaintiffs' injuries.

Respectfully Submitted,

DEFENDANTS

By their Attorneys,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ James R. Lee
JAMES R. LEE (4305)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

/s/ Brenda D. Baum
BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

/s/ John M. Moreira
JOHN M. MOREIRA (7371)
Special Assistant Attorney General
R.I. Department of Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2411
Fax: (401) 222-3016
jmoreira@riag.ri.gov

**CERTIFICATION**

I hereby certify that I have electronically mailed the foregoing document on this 22nd day of May, 2008, to the attorney(s) of record listed below:

**V. Edward Formisano, Esquire**
edf@sfclaw.com

/s/ John M. Moreira