# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ASTRID G. ESTRADA, WENDY M. ESTRADA, GUILFREDO E. MUNOZ, JOSE A. AQUINO, CRUZ F. RIVERA, CARLOS E. TAMUP, JOSE BURGOS, ABELINO M. URIZAR, ISRAEL TEBALAN, ROLANDO NORIEGA, BORIS R. CRUZ and ELSA HERNANDEZ VILA VICENCIO

vs. C.A. NO. 07-10ML

STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARE, individually and in his official capacity as Superintendent of the Rhode Island State Police, THOMAS CHABOT, individually and in his official capacity as a state trooper employed by the State of Rhode Island, JANE DOE, individually and in her official capacity as a state trooper employed by the State of Rhode Island

**DEPOSITION OF ASTRID G. ESTRADA CABRERA**

Monday, March 31, 2008

11:30 a.m.

Rhode Island Department of Attorney General

150 South Main Street

Providence, Rhode Island 02903

\- - -

Heather A. Lussier, CSR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886
(401) 739-3600

verbally using your voice and not just shaking your head so the stenographer can get it down.

A. Okay.

Q. If I ask you a question and you don't understand what I'm asking, please let me know through Mr. daSilva, and I'll rephrase it.

A. Okay.

Q. What is your date of birth, Ms. Cabrera?

A. May 25th, 1983.

Q. And how old are you?

A. Twenty-four.

Q. And where do you currently reside?

A. 12 Orteleva Street.

Q. O-R-T-E-L-E-V-A. Is that in Providence?

A. Yes.

Q. Do you live there with anyone?

A. Yes.

Q. Who lives there with you?

A. My husband, my daughters and my aunt live there.

Q. And what is your husband's name?

A. Guilfredo Estrendo Carmay Munoz.

Q. And how long have you been married?

A. About eight years.

Q. Were you married in Guatemala?

A. Yes.
Q. Okay. And how many children do you have?
A. Two.
Q. Two girls? Two boys?
A. Two girls.
Q. And how old are your girls?
A. One is seven years old. The other one is three.
Q. What is the name of the aunt that lives with you?
A. Maria Estrada.
Q. How long have you lived at that address?
A. Two years.
Q. Where did you live before that?
A. 27 Sears Avenue.
Q. Did you live there with your sister?
A. No. I lived on the first floor.
Q. Okay. And how long did you live at Sears Avenue?
A. About three years.
Q. And before Sears Avenue, where did you live?
A. No.
Q. Did you live in Guatemala before Sears Avenue?
A. Yes.
Q. You have to let Mr. daSilva translate before you answer. Okay?
A. Yes.

Q. When you came to the United States, did you come to the United States under a student visa?

A. No.

Q. Did you come to the United States under a work visa?

A. No.

Q. Did you come to the United States under a resident visa or a green card?

A. No.

Q. Did you come to the United States under any sort of government documentation?

A. No.

Q. Ms. Cabrera, do you speak English?

A. I understand a bit.

Q. Okay. Do you speak a bit?

A. No.

Q. Okay. When you say understand a bit, are you able to understand a little of what I'm saying now?

A. Yes.

Q. Okay. Did you attend high school in Guatemala?

A. Yes. High school.

Q. Did you take any classes in high school regarding learning to speak English?

A. Yes. They give the basics.

Q. Okay. When you say the basics, can you describe it a

little?

A. How, for example, do you say, what's my name? Where are you from? Good morning. The basic just to get going.

Q. Okay. And that was one class in school?

A. Yes.

Q. Did you take any other classes in school on speaking or understanding or writing English?

A. No.

Q. Have you taken any classes while you've been over in the United States on speaking or understanding English?

A. No.

Q. Ms. Cabrera, do you currently have a job?

A. No.

Q. What was the last job you worked that you had?

A. The last employment?

Q. Yes.

A. At Cimini Association in Westerly.

Q. Okay. When did you stop working there?

A. The last -- the very last would be somewhere around six, seven weeks. I don't remember exactly.

Q. Okay. Why did you stop working there?

A. Right now I stop working there because the job was scarce.

Q. Okay. What type of work were you doing there?

was was that we were trying to remember what words -- what words in English that he said that we remembered he said.

Q. What words in English do you remember that you told Wendy you remembered the policeman saying?

A. That I remember, right?

Q. That you remember.

A. That -- that if somebody -- well, I don't remember the exact words in English. It had to do with the effect that if we didn't want to die on that day, nobody should get out of the van.

Q. When you were talking with Wendy yesterday, did you tell her you remembered the policeman saying anything else?

A. That what he said to the driver that nobody should get out and that -- that he was going to accompany us in custody to take us over to Immigration.

Q. Do you recall the trooper saying -- that you understood the trooper saying anything else?

A. When one of my -- one of our coworkers handed over his consular card, he used some bad words with regard to it.

Q. What was the bad words you heard the trooper say?

A. Can I say it?

Q. Yes, please.

A. That my coworker handed over a card like this over, and he said, what? What? What is this shit?

were chatting about was what went on that day, the things that happened. And what he corrected was -- he said the whole sentence, everything that the trooper had said in English.

Q. What sentence did your husband say the trooper said in English?

A. Well, that -- about the threat that nobody could get out of the van. Well, since he was sitting up front next to the driver, he got to hear more of what was said. And what really went on yesterday was more like a chat, like a chat among -- in the family about -- about the things that happened that day.

Q. Okay. So your husband reminded you and your sister what he understood the trooper to have said in July of 2006?

A. Well, what it was was that since my husband has a better command of English that he was able to remember in English the whole sentence that the trooper said about -- on that day that nobody should get out of the van.

Q. And what exactly did your husband say he remembered the trooper say about no one getting out of the van?

A. Well, do I have to say it? Can I say it to you in Spanish?

Q. You can say it in Spanish, and Mr. daSilva will translate it.

A. What -- okay. Well, what my husband said was that --

that whole thing about -- that since they were going to take us to Immigration, that nobody could step out of the van, and that if anybody tried to, that they would shoot at us.

Q. Was there anything during your conversation between your sister and your husband and you yesterday that they remembered about July of 2006 and you hadn't remembered?

A. No.

Q. When was the last time you spoke to anyone else who was in the van with you that day other than Wendy and your husband?

A. No. No. We haven't spoken with anybody. The ones who were going in the van, right?

Q. Yes.

A. No.

Q. Other than the word, shit, did the trooper use any other bad words during this stop in 2006?

A. Yes. Yes. I don't know exactly how to put it in English. What he said to us was the equivalent in Spanish of what the fuck are you doing in this country?

Q. Do you remember whose ID he looked at that he ended up saying what the shit is this?

A. Yes.

Q. Whose?

A. Cruz. He or she is called Cruz.

Q. Cruz Rivera?

A. I don't know the -- that other last name. I just know it's Cruz.

THE INTERPRETER: Can I add a note from her reply? I don't know whether it was a he or a she in Spanish. It doesn't have to be indicated. So that's why I said he or she. She didn't actually say he or she.

Q. Okay. Ms. Cabrera, I'm showing you a very poor drawing of a van, and I'd ask you if you could mark where you were sitting on July 11, 2006.

A. This is the driver supposedly, right?

Q. Yes.

A. Here.

Q. Could you mark an "X" where you were sitting?

(Witness complies)

Q. Okay. I would like the record to reflect that Ms. Cabrera has marked an "X" where she was sitting on July 11, 2006. Do you know -- do you remember where Wendy was sitting on that day?

A. Yes.

Q. Okay. Could you make a mark on the picture to show where your sister, Wendy was sitting?

A. Yes.

(Witness indicates)

Q. This window directly next to you was slightly open?
A. Yes. Yes.
Q. Do you remember any other windows open in the van when the State Police stopped the van in July of 2006?
A. I don't remember.
Q. When the van was stopped, did the driver turn the van off?
A. I don't remember.
Q. When the van was stopped, was there other traffic going by on the highway?
A. Yes.
Q. Please tell me everything you remember from when the State Police stopped the van on July 11, 2006.
A. Okay. Well, we were on our way to work like around 6:30 in the morning. Well, I was going along with sort of my eyes closed. And I heard -- the only thing else I heard was when somebody said that the police had turned their lights on for us. And then the driver pulled over to his right so as to stop. That's when the policeman then came up to the driver, and he asked him for the registration, the license and the insurance for the car. And then through the driver's window, he looked at all of us towards the back. And he came around. And the one who was up here up front with the driver, he asked him for his ID. And then he opened the van's doors, and he

asked each and every one of us for an ID. Some of us didn't have any IDs on us. And the ones that handed them over, he took them. And he asked us where we were headed, and he asked us if we had any permission or any license to be in this country. And we said, no. And then he came and closed the door to the van, and he headed over to his car.

And he hung around there, and then he went over again right up to the driver of the car. He got him out of the van. And he took him to the back of the van, and he patted him down all the way. And then he had him get back in. He went once again back to his car. And then some -- I think two or three more policemen arrived. And he had the driver get out of the car like to two or three times. And the last time he had him get out, and the last time he got out of the car is when he told us that nobody was to get out of the car and that we were going to go under the responsibility of the van's driver. And that if nobody wanted to die that day we shouldn't try to get out because he could shoot at us and that we were to follow him, that he was going to take us to Immigration downtown.

And he went like towards the front of the van, and a woman police officer went behind the back of the van. And then under a bridge like five, ten minutes from where he had stopped us, he once again had us -- he stopped us. And

then he got out, came over to the van. He went around the van, and he checked all the doors. After that, he got back in his, and he took us to Immigration. And he handed us over at Immigration. And then I saw when the policeman dropped the ticket that he had for the driver at an Immigration official's desk.

Q. Can you remember anything else?

A. About the policeman, just that.

Q. Okay. When you said that you first realized a police car was behind you when someone said the police had turned your lights on for you -- their lights on for you, --

A. Yes.

Q. -- who said that?

A. All the guys who were in there.

Q. Did they say anything else other than the police have turned their lights on for us?

A. No.

Q. You said that that policeman came up to the driver's side window?

A. Yes.

Q. And you indicated that the policeman asked the driver for his license, registration and insurance?

A. Yes.

Q. Did you understand what the trooper was saying in

English to the driver?

A. Yes. I understood a bit, not everything.

Q. What words did you understand the trooper say to the driver at that first time?

A. When he asked him for the license, the insurance and the registration.

Q. Did you understand anything else that the trooper said in English to the driver at that time?

A. Not on that occasion.

Q. Okay.

A. Yeah.

Q. The driver gave the trooper some documents?

A. Yes.

Q. From there, where did the trooper go? Where did you see the trooper go?

A. I don't remember.

Q. Okay. Do you remember the trooper asking your husband in the passenger seat any questions?

A. Yes. All he asked him for was his ID.

Q. And you could understand what the trooper was saying in English?

A. Yes.

Q. Did your husband answer the trooper?

A. Yes.

Q. What do you remember your husband saying to the trooper?

A. That he didn't have an ID on him, that he had left it at home. He had forgotten it at home.

Q. Okay. Was it that time that the trooper opened up the passenger's side doors?

A. Yes.

Q. Okay. What do you remember the trooper saying when he opened the passenger side doors?

A. The first thing he said was that he wanted everybody's IDs.

Q. Okay.

MS. BAUM: Sorry. Do you need to finish?

THE INTERPRETER: No. I was just doing your "okay".

Q. Okay. Did you answer the trooper?

A. Yes.

Q. What did you say to the trooper?

A. That I had forgotten my ID.

Q. Did you have any ID on you?

A. No.

Q. Okay. Did anyone else say anything to the trooper?

A. No.

Q. You were the only person in the van to say anything to

the trooper?

A. Yes. And the driver also. The driver understands and speaks a bit of it.

Q. When you said that to the trooper, did you forget your ID, or were you just making that up as an excuse?

A. No. Yes. I had forgotten my ID.

Q. What ID did you forget at home?

A. My consular card.

Q. Did you tell the trooper that you forgot your -- the consular card at home?

A. Yes.

MS. BAUM: Can you just read that back.

(PREVIOUS QUESTION AND ANSWER READ BACK BY COURT REPORTER)

Q. What is a consular card?

A. It's a card that you can carry around so that you don't have to carry your passport around, and it contains your nationality, where you're from, your date of birth and your names.

Q. Okay. What words did you use to tell the trooper that you forgot your consular ID at home?

A. Should I say it in English or Spanish?

Q. Say it whatever way you said it to the trooper that day.

A. I forget in my house.

Q. Okay. Did you say consular card?
A. No.
Q. Okay. How many people in the van gave the trooper IDs that day?
A. I don't remember.
Q. Did your sister?
A. No.
Q. Did your sister, Wendy say anything to the trooper?
A. I don't remember.
Q. Did the trooper ask the driver to translate for him?
A. Well, the -- the trooper -- the driver didn't --
THE INTERPRETER: Can I start again?
A. Well, the -- the trooper didn't --
THE INTERPRETER: I'm sorry. I've forgotten.
MS. BAUM: Do you want the question read back?
THE INTERPRETER: Yes.
(PREVIOUS QUESTION READ BACK BY COURT REPORTER)
A. No.
Q. The trooper asked you -- everyone in the van where you were headed?
A. Yes.
Q. Did anyone answer the trooper?
A. The driver.
Q. What did the driver say?

A. That we were going to work.
Q. At this time, were you nervous?
A. No.
Q. You said that the trooper asked you all in the van whether you had permission or license to be in this country, and someone said no?
A. No. When he asked, we all said no.
Q. Everyone in the van said the word, no?
A. No. Not everybody. Just with their faces.
Q. Okay. So some people in the van actually said the word, no?
A. I don't remember. I know that I was one of those who said no.
Q. So you said the word, no?
A. Yes.
Q. And when you say people said no if they -- with their faces, what do you mean?
A. When he said that and the driver told us what it was that he had said, we all sort of did like this.
MS. BAUM: Okay. I would like to reflect for the record that the -- what no means is shrugging and shaking the head if that's accurate. And I'm just going to ask the translator: Is that correct.
THE INTERPRETER: I think so. I'm not a

gesture specialist.
Q. But that's the gesture you were making?
A. Yes.
Q. Ms. Cabrera, do you -- did you understand the trooper to say anything else while he was standing in that doorway there?
MR. PUSHEE: I'm going to object just to the form of the question. Could you just be specific for the record what you're saying?
Q. I'll rephrase it. When the trooper was standing in the passenger side open doors, do you remember him saying anything else, or could you understand anything else he said in English?
A. No. When he came over here and opened the doors, what I understood was where are we headed, where did we work, if we had a permit or a residency to be in this country, that he wanted the IDs. And that when my fellow worker handed over the consular card, that's when he used those bad words that I didn't want to use.
Q. Thank you for repeating that, for clearing it up.
A. Nothing -- you're welcome.
Q. So the trooper closed the doors?
A. Yes.
Q. Did you see where he went after that?

A. I don't remember.
Q. Okay. Did you look around at all when you were sitting in the van?
A. Around -- inside or outside?
Q. Outside the van.
A. Yes.
Q. At some time, the trooper came back and asked the driver to step out of the car?
A. Yes. Two or three times he had him get out.
Q. Did they always go and stand in the same place those two or three times?
A. Yes.
Q. Okay. Could you put a circle where the trooper and the driver stood?
A. It was over here in the back part.
Q. I would ask the record reflect that Ms. Cabrera has indicated a circle where she recalls the trooper and the driver going to speak two or three times. Ms. Cabrera, is this where you saw the trooper pat down the driver?
A. Yes.
Q. And could you describe how -- what you mean by he patted him down?
A. He had him put his hands like this upwards onto the van, and he touched him all over.

Q. Okay. Did the trooper and the driver have a conversation back here those times?

A. I don't remember.

Q. Where was the trooper standing when you heard him saying that no one was to get out of the car or if they did they would die and he would shoot?

A. There.

Q. They were back here behind the van?

A. Yes. Back there.

Q. What exactly did you understand the trooper's English saying at that time?

A. What I heard him say to the driver was that it's your responsibility to take these people and to make sure that nobody moves, that if any body moves, they're going to lose their lives. I'm going to shoot them.

Q. When the driver came back in the van, did he say anything to the passengers in the van?

A. Yes.

Q. What did the driver say?

A. That the policeman -- he turned back to us and said that the policeman said that you are all my responsibility and that none of you are to move. You're to keep still. That if anybody moves or tries anything, he might shoot.

Q. Okay. Did the driver and the trooper have more

conversations out here that you just didn't hear?

A. I don't remember. I just remember him saying that -- that I told you that we were his responsibility and that he was to take us to follow them and take us to Immigration.

Q. Did you tell anyone else in the van what you had heard?

A. Yes.

Q. Who did you tell?

A. I didn't say anything individually. I simply said, has everybody heard, that the policeman says he's taking us to Immigration?

Q. Did you say anything to anyone else in the van about the officer shooting?

MR. PUSHEE: Brenda, just for the record, were you talking about still while they're in the van at this point?

MS. BAUM: While everyone was in the van, except for the driver and the policeman.

A. I didn't understand.

Q. Okay. Did you tell anyone in the van after saying we're going to Immigration that the officer said that he would shoot?

A. Yes.

Q. What did you say?

A. I said, be quiet so that I can hear what's being said. And I said then to everybody that they shouldn't move, that I thought the policeman had said they shouldn't move, that he might shoot. But I wasn't sure about the shoot part until the driver came back.

Q. What made you sure about the shoot part when the driver came back?

A. Because the -- through the word, I wasn't exactly sure. I couldn't believe that they would use a word like that about shooting. I wasn't sure about that word, shooting because I couldn't believe it.

Q. But what did the driver say when he came back that made you believe that you got the word, shoot correct?

A. Because the pilot said it to us in Spanish, and he said it to us in English.

Q. What did the driver say to you exactly in Spanish when he came back to the car?

A. Well, that -- that -- that when he came back he turned back towards us. And he said, everybody hear that, and did everybody hear that the policeman said that we have to go under his responsibility to Immigration and that everybody is to remain seated still, that nobody's to move or anything, that because then he can do that, that he will then -- if he has to, he'll shoot?

Q. So you're saying the driver said to the passengers in Spanish that the trooper could shoot?
A. Yes.
Q. And by the driver saying that, that made you believe you heard the conversation between the driver and the trooper correct?
A. Yes.
Q. Did the driver say anything else to the passengers other than what you've testified to?
A. No. No.
Q. Did anyone say anything on the drive in to Providence?
A. No.
Q. No one spoke?
A. No. No. Because none of us could really think of what it was that was going to happen to us then. Well, what I did was to call the daycare to let them know about my children because both my husband and I were together in the van.
Q. Did anyone else talk or make phone calls?
A. No. No. I don't remember.
Q. Were you nervous at this point?
A. I was nervous and sad.
Q. You were nervous and sad because you were going to Immigration and might have to go back to Guatemala?
A. Yes. Because of my children.

MS. BAUM: I'm just going to get some tissue.

MR. LEE: Do you want to take a break?

Q. Would you like a break?

A. No. It's okay.

Q. Would you like some water?

A. Yes.

(RECESS)

Q. Ms. Cabrera, when you -- when the van got to Immigration, what happened?

A. The policeman went into Immigration, and the woman policeman was taking care of us. And then some Immigration agents came out with a policeman. They asked us where we were from and if we had documents that allowed us to be in this country. And as all of us said no, they had us get out. And they separated the women from the men, and they had the -- each group get into a different room. And then that's when I saw that the policeman dropped off the ticket that he had for the driver at an Immigration agent's desk. And there -- and Immigration, they took us one by one to get our fingerprints and data from us.

Q. Do you have a hearing scheduled with Immigration?

A. Well, I and Carlos, we were in court about a month ago.

Q. And what happened?

A. The female judge gave me voluntary departure.
Q. Do you have a date for voluntary departure?
A. The female judge had told me that today's date that I was supposed to go, but she gave me the right to an appeal so that I would be able to stay here more or less an additional year.
Q. So as of right now, you don't have a set departure date?
A. No.
Q. Did you pay Carlos to drive you to work?
A. Yes. We paid him. We paid him weekly.
Q. How much did you pay him weekly?
A. Thirty.
Q. Thirty dollars a piece?
A. Yes.
Q. Do you remember sometime after this July 11, 2006 speaking with another State Police officer at St. Theresa's Church?
A. Yes.
Q. And he asked you to tell him what happened on July 11, 2006?
A. Yes.
Q. And there was a translator there as well to translate his English to Spanish for you?

A. Yes.
Q. Okay. And you understood the translator?
A. Yes.
Q. Okay. And you answered the questions truthfully?
A. Yes.
Q. Do you know a State Policeman named, Colonel Steven Pare?
A. I don't remember. I don't remember.
Q. He's the head of the State Police.
A. I don't understand the question.
Q. Okay. Colonel Pare, he's the top man at the State Police in July of 2006.
A. I don't remember.
Q. Okay.
A. I don't remember.
Q. Do you know what kind of training the State Police get to stop cars?
A. No.
Q. Ms. Cabrera, you spoke to your pastor about what happened on July 11, 2006?
A. Yes.
Q. When's the last time you spoke to him about July -- what happened in July of 2006?
A. I don't remember the date.

Q. Was it more than a month ago?
A. Yes.
Q. More than six months ago?
A. Yes.
Q. Okay. And when you would speak to him, would it be about the fact that Immigration wanted you to leave the United States?
A. I spoke with my pastor about everything. I spoke with him.
Q. Okay. Did you speak to him about the Rhode Island State Police stopping the van on July 11, 2006?
A. Yes.
Q. I'm showing you -- I'm going to mark them, please. Actually, first, I'm going to mark the drawing of the car with Ms. Cabrera's markings on it as Exhibit A.

**(Defendant's Exhibits A, B and C marked)**

Q. Ms. Cabrera, I'm showing you documents which have been marked Exhibits B and C. Do one of those documents contain your signature?
A. Yes.
Q. Which document contains your signature?
A. This one.
Q. I would like the record to reflect that Exhibit B has Ms. Astrid Cabrera's signature on it. Do you recognize whose

signature is on the other document?

A. Yes.

Q. Whose signature is that that you recognize?

A. My sister's.

Q. Okay. I would ask that the record reflect that Exhibit C Ms. Cabrera has indicated contains her sister's signature. And that is your sister, Wendy Cabrera Estrada, correct?

A. Yes.

Q. And these are complaints that you signed for the ACLU?

A. Yes.

MS. BAUM: Okay. I'm going to ask that be marked as Exhibit D.

**(Defendant's Exhibit D marked)**

Q. And Ms. Cabrera, I'm showing you a document we marked as Exhibit D and ask if you've ever seen that before?

A. Yes.

Q. And that's the complaint that was filed on your behalf by the ACLU about the State Police stopping you on July 11, 2006, correct?

A. Yes.

Q. Okay. And someone read that complaint to you in your native language of Spanish, correct?

A. Yes.

Q. Okay. And you told that -- when that was read to you, it set forth your full -- it set forth your memory regarding what happened when the State Police stopped you on July 11, 2006?

THE INTERPRETER: Could you repeat the first part?

Q. Yes. When that statement was read to you in Spanish, you agreed that it said what happened to you when the State Police stopped you on July 11, 2006?

A. Yes.

Q. Ms. Cabrera, when is the last time you spoke with the driver, Carlos Tamup?

A. No. We didn't speak. We just saw each other on Thursday.

Q. You didn't speak about the deposition today?

A. No.

Q. Did you say anything about the State Police stopping the van in July of 2006?

A. With Carlos?

Q. Yes.

A. No.

Q. When is the last time you talked with Carlos Tamup about the State Police van stopping you in July of 2006?

A. No. No. I don't remember.

Q. Okay. Was it more than a month ago?
A. Yes. It's been some time.
Q. More than six months ago?
A. No. No. I don't remember, remember at all in truth.
Q. Have you talked to him since Thanksgiving time about the State Police stopping you in July of 2006?
A. I don't remember.
Q. In some answers that you gave to us, you indicated that because of the State Police stopping the van in July of 2006 that you've been embarrassed, humiliated and increased stress. Can you explain that to me, please?
A. That I should explain it to you how, in what way?
Q. What do you mean you've been embarrassed, humiliated and very stressed?
A. Well, ever since that day, I -- as a person, I don't tell anybody about my situation in this country. And since that day, the majority of people have come to realize that I was present in this country without any documents. And my daughter, the bigger one, she will listen. She will look. Why did I have to -- she would ask me say why did I have to go to a court? Why was I afraid of a policeman? And why didn't I have a paper so that the policeman will leave me alone so that he wouldn't do anything to me. And for me, it's stressful because I was planning to go back to my country but

not under these circumstances and in this way, even more so since my daughter is doing well at school and speaking very good English and the advantage that this country has insofar as I can give my daughters a better life. And that, in fact, is what causes me stress and the situation back in my country. That's what has me nervous here and all stressed out.

Q. Is it fair to say what has you nervous is your ability to stay in the United States is limited, and you will be deported back to Guatemala?

A. In reality, what causes me nervousness is the way in which I'm going to be deported because I was seated in a passenger van.

Q. You think the only reason why you're going to be deported is because you were sitting in the van?

A. Yes. Because I've never had problems with Immigration.

Q. Okay. But you don't have a green card to be in the United States, correct?

A. No. I don't have it.

Q. You don't have a work or residency visa to be in the United States?

MR. PUSHEE: Just object. Objection. It's been asked and answered.

Q. Correct?

A. Yes.

Q. And you're not here under a student visa either, correct?

MR. PUSHEE: Same objection.

A. No.

Q. Did the male trooper ever touch you?

A. No.

Q. Did he touch anyone in the van other than the driver, Carlos Tamup?

A. No.

Q. Can you think of anything that occurred on July 11, 2006 when the van was stopped by the Rhode Island State Police that you haven't told me today?

A. No.

MS. BAUM: I have no other questions. Thank you.

(DEPOSITION CONCLUDED AT 12:54 P.M.)