# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ASTRID G. ESTRADA, WENDY M. ESTRADA, GUILFREDO E. MUNOZ, JOSE A. AQUINO, CRUZ F. RIVERA, CARLOS E. TAMUP, JOSE BURGOS, ABELINO M. URIZAR, ISRAEL TEBALAN, ROLANDO NORIEGA, BORIS R. CRUZ, and ELSA HERNANDEZ VILAVICENCIO,

vs. C.A. No. 07-10ML

STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARE, individually and in his official capacity as Superintendent of the Rhode Island State Police, THOMAS CHABOT, individually and in his official capacity as a state trooper employed by the State of Rhode Island, JANE DOE, individually and in her official capacity as a state trooper employed by the State of Rhode Island,

DEPOSITION OF THOMAS CHABOT, a witness in the above-entitled cause, taken on behalf of the Plaintiffs, before Devin J. Baccari, CSR, a Notary Public in and for the State of Rhode Island, at the Law Office of Sinapi, Formisano & Co., LTD., 100 Midway Place, Suite 1, Cranston, Rhode Island, on October 29, 2007 scheduled at 1:30 p.m.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

A. Yes.
Q. And college?
A. I'm not a college graduate.
Q. Okay. Did you attend schooling after high school?
A. I did.
Q. Okay.
A. College.
Q. All right. Military?
A. No.
Q. And did you have any significant employment before you became a State Trooper?
A. Yes.
Q. Okay. What did you do before you became a State Trooper?
A. I was a union electrician and I was a musician.
Q. And when did you attend the Academy?
A. In January of 2000.
Q. And while you were at the Academy, did you have training that had to do with Terry stops?
A. I believe we did, yes.
Q. And Terry patdowns?
A. Yes.
Q. And since the Academy, have you had any

began on the 10th.
Q. Okay. And what time did your shift begin on the 10th?
A. 9:00 p.m.
Q. And when would your shift have ended?
A. 8:00 a.m. on the 11th.
Q. Okay. And according to your report, you were pulled over on a median of 95, correct?
A. I was on a post in the center median on 95. That's correct.
MR. FORMISANO: Do you want to take a break?
THE WITNESS: No.
MR. FORMISANO: Are you okay? Okay.
Q. Your report refers to a "fixed radar post." What does that mean?
A. In all my reports, if I'm posted up on the highway, that's how I state exactly where I am.
Q. So were you conducting radar on the --
A. Yes, I was.
Q. All right. And you were stopped at the time you saw the car that was driven by Carlos Tamup, correct?
A. Say the question again.
Q. You were stopped in the median when you saw the

car driven by Mr. Tamup, correct?
A. Correct. I was not moving.
Q. Okay. And what direction were you facing, Trooper?
A. I was facing north --
Q. Okay.
A. -- looking at the southbound traffic.
Q. And what caused you to stop the van containing these 14 individuals?
A. The van made a lane change from the right-hand lane to the left-hand lane without the use of its turn signal directly in front of me.
Q. And that's a two-lane roadway, correct?
A. That's correct.
Q. And the traffic at that time of day, was it light, heavy, moderate?
A. I believe it was medium.
Q. Medium. And what would you define as medium traffic, sir?
A. Lighter than heavy and more moderate than light.
Q. Were there cars around the van?
A. Not to my recollection.
Q. Were there cars -- did you observe any cars behind the van?

A. Quite frankly, there were other cars about the van. How many cars there were, I do not know.
Q. When you say "about the van," what do you mean by that?
A. There were cars in front of the van, cars behind the van.
Q. Were there cars alongside the van when it moved from the first lane to the second lane?
A. No.
Q. All right. Were there cars immediately behind the van when it moved from the first lane to the second lane?
A. I -- I do not recall.
Q. So the van moved from the first lane to the second lane and then you decided that you were going to stop the van, correct?
A. That's correct.
Q. Okay. And you engaged your overhead lights, correct?
A. Correct.
Q. All right. And the van -- how did you signal to the van to pull over?
A. How did I what?
Q. How did the van know to pull over, do you know, the lights?

A. Must have seen my lights.
Q. All right. So you traveled behind the van and the van pulled over, correct?
A. Correct.
Q. All right. And anything unusual occur between the time that you began to pursue the van and the stop itself of the van?
A. No.
Q. All right. And did you call in before you got out of your cruiser?
A. I believe I called out the stop, if that's what you mean.
Q. Yeah. All right. And you approached the driver of the van, correct?
A. Correct.
Q. All right. And you requested that he give you identification, the registration, correct?
A. His license, registration, correct.
Q. And he complied with that request?
A. Yes.
Q. All right. Now, up to this point, were you aware that there were other occupants in the van?
A. When I first approached the van, I was not.
Q. All right. So once you approached the van, you became aware there were others in the van,

correct?
A. Correct.
Q. All right. Can you describe the van itself?
A. It was a typical -- I call it a 15-passenger van.
Q. Okay. Windows weren't tinted, correct?
A. I do not recall.
Q. All right. Would your report have noted if the windows were tinted?
A. Yes.
Q. Okay. So Mr. Tamup provided you with a license and a registration and you, then, asked for identification from the other passengers in the car, correct, in the van?
A. I believe I did.
Q. All right. And this was before you ran a check on Mr. Tamup, correct?
A. Correct.
Q. And you asked for Mr. Tamup's assistance in obtaining identification from the passengers, correct?
A. Yes.
Q. Did anything unusual occur up to this point with respect to Mr. Tamup?
A. Other than seeing him move about his vehicle,

just obtaining his license and registration.
Q. All right. But you were standing right alongside when he was obtaining the license and registration?
A. No, I was not.
Q. All right. Were you slightly --
A. Correct.
Q. -- behind the driver's side door?
A. Correct.
Q. But you didn't see anything unusual with respect to Mr. Tamup's actions when he was obtaining his license and registration?
A. I did. I saw him reach towards the center console, reach down by the floor area.
MR. FORMISANO: Jim, this is a whole package of materials that were produced. Rather than -- I think I'm going to ask a couple questions about one or two of the documents in this package, so I'll just have it marked.
(Plaintiffs' Exhibit Number 1 was so marked.)
MR. FORMISANO: Trooper, this is a document that's just been marked as Exhibit 1. And the first several pages of your incident report, I'll just ask you to scan that, if you

Q. Okay. Well, after he reached, did he give you his license and registration?
A. Yes.
Q. Okay. And it was at that point that you asked for identification from the other passengers, correct?
A. I believe so.
Q. All right. Now, in your report, you reference in several places difficulty communicating?
A. Correct.
Q. Okay. Mr. Tamup is Hispanic, correct?
A. I -- I assume he is.
Q. All right. And the other individuals in the vehicle are of Hispanic decent, correct?
A. They appeared to be.
Q. And do you speak Spanish?
A. I do not.
Q. Okay. Now, before you ran the check on Mr. Tamup's license, you asked him a couple questions, didn't you?
A. I don't recall.
Q. All right. Well, do you recall asking him where he was going?
A. Yes.
Q. Okay. And did he answer you?

were going to Westerly to polish jewelry.
That's -- that's what I could understand of
Mr. Tamup.
Q. Did you also understand that they were going to
work?
A. Yes.
Q. All right. Why did you need identification from
the passengers, Trooper?
A. Why do I need?
Q. Why did you?
A. I request identification from anybody in any
vehicle that I've stopped since I got on the
State Police.
Q. So it's your standard operating procedure to ask
for ID from anyone who may be in a vehicle that
you stop?
A. That is correct.
Q. Driver or passenger?
A. Both.
Q. Okay. Now, what is your policy, practice or
procedure if passengers do not have some type of
identification?
A. I interact, engage in conversation, attempt to
obtain their name, their date of birth, their
address, what they do for work, if they've been

information as to the passengers from Mr. Tamup?
A. Correct.
Q. All right. And did you get any information as to the passengers? Strike that.
Did Mr. Tamup obtain any information that you were interested in getting from the passengers?
A. Other than a couple forms of ID from a couple of the passengers.
Q. And was this question and this exchange, this was occurring on the side of 95, correct?
A. Correct.
Q. And were you now on the passenger side of the van or the driver's side still?
A. I believe I was on the passenger side.
Q. According to your report, Trooper, you were interested in credentials proving U.S. citizenship?
A. That was following the questions of any type of identification.
Q. Well, again, is it your standard practice if someone does not have a license -- and I'm referring to passengers -- that you request documentation as to U.S. citizenship?
A. Not necessarily.
Q. Why did you ask these passengers for

Q. And what other steps in your investigation followed after the passengers didn't respond to the request for identification?
A. I believe I went back to my cruiser at that time.
Q. You ran a check at this point on Mr. Tamup's license, correct?
A. Correct.
Q. And that check was negative, correct?
A. Correct.
Q. Now, is it your understanding that -- or belief that individuals who don't speak English must carry credentials proving citizenship?
A. Say that again.
Q. Is it your understanding that individuals who do not speak English must carry proof of citizenship?
A. No.
Q. All right. You were concerned, though, in this case, that these passengers did not have proof of citizenship, correct?
A. I was -- I was concerned with the fact that 99.9 percent of the people that I stop always have identification on them. And if not, it's extremely easy to tell whether the person is

documentation proving U.S. citizenship?
A. Because nobody had any identification on them whatsoever.
Q. Did you have a hunch that these individuals were not U.S. Citizens?
A. Yes.
Q. All right. Did you have a hunch that they were in the country illegally?
A. I suppose a hunch, yes.
Q. And what was the hunch based on, Trooper?
A. It is typically of any motor vehicle that I stop somebody in the vehicle can produce some sort of identification, an address of where they stay and credentials showing them to live wherever they say they do.
Q. Okay. At two points during the stop, you conducted a Terry patdown search, correct?
A. Correct.
Q. All right. And the Terry patdown search was conducted on Mr. Tamup, correct?
A. Correct.
Q. All right. According to your report, you conducted the first Terry patdown search after you sought identification from the passengers, correct?

A. I -- I don't know without reading the report, sir.

Q. Here's your report and it's right here in the third paragraph, Trooper. So you conducted a Terry patdown search after you asked for identification from the passengers, correct?

A. It appears that way.

Q. Okay. Why did you conduct a Terry patdown search on Mr. Tamup after you asked for identification from the passengers?

A. Just for my safety.

Q. Okay.

A. At that point, he was outside the van.

Q. All right. Well, what was it that gave rise to concern for your safety at this point?

A. I had 14 people in the van. And then once Mr. Tamup is in the van and he comes out of the van, I have no idea what he might have brought with him from the van, whether it be a knife, whether it be a weapon of some sort, so for my safety I conducted a Terry pat.

Q. Did you ask Mr. Tamup to assist you in obtaining information from the passengers?

A. Yes.

Q. Okay. And did you observe Mr. Tamup leave the

driver's seat of the van and come around to the passenger side of the van?
A. I believe I did.
Q. All right. Anything unusual occur as Mr. Tamup walked from the driver's side of the van to the passenger's side of the van?
A. No.
Q. And it was broad daylight when this stop occurred, correct?
A. Yes, it was daylight.
Q. Okay. Now, according to your report, when Mr. Tamup complied with your request and asked the passengers for identification, the passengers remained still and did not say a word; is that accurate?
A. Yes.
Q. All right. Now, why not leave it there, Trooper? If they didn't respond to your question, you said earlier your practice was that you'd just move on if people don't answer your questions. Why didn't you just move on that point, process the traffic violation and move on?
A. Because I feel as though I wouldn't be doing my job if I didn't investigate it a little further.

telling me the truth of who they are or who they are not (sic).
Q. You ran the check on Mr. Tamup and then you contacted immigration and customs, correct?
A. Correct.
Q. And you informed the individual that you were speaking with at ICE that you believed you had illegal immigrants in a van, correct?
A. It appeared to be that way.
Q. And why did you believe that the passengers were illegal immigrants?
A. Just a hunch.
Q. Okay. Now, you then spoke with someone by the name of Burke, correct?
A. Correct.
Q. And what do you recall about your discussion with Agent Burke, Trooper?
A. I'd have to refer to my report.
Q. Okay. Did you review any documents before you came here today, sir?
A. Other than my incident report, no.
Q. When did you review your incident report?
A. I don't recall.
Q. All right. Well, in preparing for your deposition today, did you review your incident

A. I don't know the order of events, but, yes, that was following that, yes.

Q. And did you ask the passengers whether they were interested in going to the immigration office?

A. I did not ask the passengers directly, no.

Q. Did you ask Mr. Tamup if he and his passengers were interested in going to the immigration office?

A. I believe I did.

Q. Okay. Do you have a specific recollection of asking them that -- or asking Mr. Tamup that rather?

A. I do recall asking him that, yes.

Q. All right. So you asked Mr. Tamup if he and the passengers would agree to go to the immigration office, correct?

A. Correct.

Q. All right. And he indicated that they would go to the immigration office?

A. Apparently, he did.

Q. All right. Do you know whether he did or he didn't?

A. I have no idea. Apparently, he did and they agreed.

Q. All right. According to some of the

individuals -- I think it's all the individuals
in the van -- you, through Mr. Tamup, threatened
the individuals in the van. Do you have any idea
why they would say that you threatened them?
A. I never ever threatened anybody in that van.
Q. They also claim that you made the statement that
you would shoot them if they tried to escape?
A. That's absolutely false.
Q. At some point, did another State Trooper arrive
at the scene?
A. Yes.
Q. Okay. And who was that?
A. I don't recall exactly what trooper you're
referring to.
Q. Was there more than one?
A. On a stop troopers come by and they see that I
have a motor vehicle stopped, so they'll stop by
and see if I'm okay, and if I'm okay, they'll
move on their way.
Q. Well, do you have any indication of the identity
of any trooper that may have stopped during the
course of this incident?
A. Yes.
Q. Okay. Who stopped at the scene while you were --
A. Trooper Donahue.

Q. And at what stage in the incident did Trooper Donahue arrive?
A. The very end of the incident.
Q. And when you say the "end," what do you mean by that?
A. I was waiting for Trooper Donahue at that point when we were going up to Providence.
Q. So he assisted you in escorting the van to Providence?
A. Correct.
Q. Tell me how you escorted the van to Providence, sir.
A. I was in front of the van and Trooper Donahue was behind the van.
Q. Okay. In the event the passengers and Mr. Tamup elected not to go to ICE, what was your plan?
A. Let them go.
Q. Now, in the package of documents you have in front of you, it's the last page, there's some handwritten notes and I just want to ask you a couple questions about that document.
What are these notes that are before you, sir?
A. Those are -- appears to be copies of videotapes --