# EXHIBITS C

A. Yes.
Q. And college?
A. I'm not a college graduate.
Q. Okay. Did you attend schooling after high school?
A. I did.
Q. Okay.
A. College.
Q. All right. Military?
A. No.
Q. And did you have any significant employment before you became a State Trooper?
A. Yes.
Q. Okay. What did you do before you became a State Trooper?
A. I was a union electrician and I was a musician.
Q. And when did you attend the Academy?
A. In January of 2000.
Q. And while you were at the Academy, did you have training that had to do with Terry stops?
A. I believe we did, yes.
Q. And Terry patdowns?
A. Yes.
Q. And since the Academy, have you had any

in-service training with regard to Terry stops and Terry patdowns?
A. I would say refresher, yes.
Q. Okay. And when was the last time you had a refresher in those areas?
A. I don't recall.
Q. All right. Within the last year?
A. I honestly don't recall.
Q. Would it have been the last few years?
A. Yes.
Q. All right. And do the State Police have a policy that has to do with racial profiling?
A. Yes.
Q. Okay. Have you had training with respect to that policy?
A. Yes.
Q. Okay. And when did that training occur, sir?
A. I don't recall the exact date.
Q. All right. Within the last year?
A. I don't recall.
Q. All right. What's your understanding, sir, of the grounds for conducting a Terry patdown?
A. It's for officer safety.
Q. Okay. What are the circumstances that justify a Terry patdown?

A. Make sure that I'm safe.
Q. So just so I understand your response, Trooper, a Terry patdown is justified if -- so you feel safe, is that what you're saying?
A. That's correct.
Q. All right. Is there anything else, in your mind, or do you understand that is a prerequisite to a Terry patdown search?
A. Yes.
Q. What?
A. Any type of movements within a vehicle.
Q. Anything else that you'd like to add to your response?
A. No.
Q. Is your response complete with respect to your understanding of the grounds that justify a Terry patdown?
A. Other than it's done for weapons.
Q. Okay. Anything else you'd like to add to your response?
A. No.
Q. Is your response complete?
A. Yes.
Q. Okay. On the July 11th -- let's jump to the incident now, Trooper -- you were on a patrol on

95 South, correct?
A. Yes, on July 11th. Yes.
Q. Okay. And is that an area you typically are assigned to?
A. Yes.
Q. All right. Does that area have a designated post name or a designation?
A. It's referred to the Hope Valley barracks.
Q. And is that where you were assigned in July of 2006?
A. Yes.
Q. All right. Have you always been assigned to the Hope Valley barracks?
A. No.
Q. Okay. When were you initially assigned to the Hope Valley barracks?
A. I don't recall the exact date.
Q. All right. Do you know the year?
A. Not exactly, no.
Q. Okay. Have you been down there for a few years?
A. Yes.
Q. Okay. And according to the report, the stop occurred at about 6:30 in the morning. What time did your shift begin on the 11th, sir?
A. It actually did not begin on the 11th. It

began on the 10th.
Q. Okay. And what time did your shift begin on the 10th?
A. 9:00 p.m.
Q. And when would your shift have ended?
A. 8:00 a.m. on the 11th.
Q. Okay. And according to your report, you were pulled over on a median of 95, correct?
A. I was on a post in the center median on 95. That's correct.
MR. FORMISANO: Do you want to take a break?
THE WITNESS: No.
MR. FORMISANO: Are you okay? Okay.
Q. Your report refers to a "fixed radar post." What does that mean?
A. In all my reports, if I'm posted up on the highway, that's how I state exactly where I am.
Q. So were you conducting radar on the --
A. Yes, I was.
Q. All right. And you were stopped at the time you saw the car that was driven by Carlos Tamup, correct?
A. Say the question again.
Q. You were stopped in the median when you saw the

car driven by Mr. Tamup, correct?
A. Correct. I was not moving.
Q. Okay. And what direction were you facing, Trooper?
A. I was facing north --
Q. Okay.
A. -- looking at the southbound traffic.
Q. And what caused you to stop the van containing these 14 individuals?
A. The van made a lane change from the right-hand lane to the left-hand lane without the use of its turn signal directly in front of me.
Q. And that's a two-lane roadway, correct?
A. That's correct.
Q. And the traffic at that time of day, was it light, heavy, moderate?
A. I believe it was medium.
Q. Medium. And what would you define as medium traffic, sir?
A. Lighter than heavy and more moderate than light.
Q. Were there cars around the van?
A. Not to my recollection.
Q. Were there cars -- did you observe any cars behind the van?

A. Quite frankly, there were other cars about the van. How many cars there were, I do not know.
Q. When you say "about the van," what do you mean by that?
A. There were cars in front of the van, cars behind the van.
Q. Were there cars alongside the van when it moved from the first lane to the second lane?
A. No.
Q. All right. Were there cars immediately behind the van when it moved from the first lane to the second lane?
A. I -- I do not recall.
Q. So the van moved from the first lane to the second lane and then you decided that you were going to stop the van, correct?
A. That's correct.
Q. Okay. And you engaged your overhead lights, correct?
A. Correct.
Q. All right. And the van -- how did you signal to the van to pull over?
A. How did I what?
Q. How did the van know to pull over, do you know, the lights?

A. Must have seen my lights.
Q. All right. So you traveled behind the van and the van pulled over, correct?
A. Correct.
Q. All right. And anything unusual occur between the time that you began to pursue the van and the stop itself of the van?
A. No.
Q. All right. And did you call in before you got out of your cruiser?
A. I believe I called out the stop, if that's what you mean.
Q. Yeah. All right. And you approached the driver of the van, correct?
A. Correct.
Q. All right. And you requested that he give you identification, the registration, correct?
A. His license, registration, correct.
Q. And he complied with that request?
A. Yes.
Q. All right. Now, up to this point, were you aware that there were other occupants in the van?
A. When I first approached the van, I was not.
Q. All right. So once you approached the van, you became aware there were others in the van,

correct?
A. Correct.
Q. All right. Can you describe the van itself?
A. It was a typical -- I call it a 15-passenger van.
Q. Okay. Windows weren't tinted, correct?
A. I do not recall.
Q. All right. Would your report have noted if the windows were tinted?
A. Yes.
Q. Okay. So Mr. Tamup provided you with a license and a registration and you, then, asked for identification from the other passengers in the car, correct, in the van?
A. I believe I did.
Q. All right. And this was before you ran a check on Mr. Tamup, correct?
A. Correct.
Q. And you asked for Mr. Tamup's assistance in obtaining identification from the passengers, correct?
A. Yes.
Q. Did anything unusual occur up to this point with respect to Mr. Tamup?
A. Other than seeing him move about his vehicle,

just obtaining his license and registration.
Q. All right. But you were standing right alongside when he was obtaining the license and registration?
A. No, I was not.
Q. All right. Were you slightly --
A. Correct.
Q. -- behind the driver's side door?
A. Correct.
Q. But you didn't see anything unusual with respect to Mr. Tamup's actions when he was obtaining his license and registration?
A. I did. I saw him reach towards the center console, reach down by the floor area.
MR. FORMISANO: Jim, this is a whole package of materials that were produced. Rather than -- I think I'm going to ask a couple questions about one or two of the documents in this package, so I'll just have it marked.
(Plaintiffs' Exhibit Number 1 was so marked.)
MR. FORMISANO: Trooper, this is a document that's just been marked as Exhibit 1. And the first several pages of your incident report, I'll just ask you to scan that, if you

would, or read it and I'll give you a minute so you can look through it. Off the record for a minute.

(Off the record.)

Q. So what exactly did you see Mr. Tamup do?

A. I -- I couldn't see him do anything other than reach towards the center area of the vehicle.

Q. And you referenced that as being an unusual movement?

A. Not necessarily.

Q. Okay. It's not in your report, correct?

A. Correct.

Q. All right. When he was reaching, do you know whether he was obtaining the registration?

A. I have no idea.

Q. Well, when he -- he reached to the right of the vehicle?

A. Correct.

Q. And did he reach towards the glove box?

A. I would say he reached in that direction. Whether or not he reached towards the glove box or not, I don't know.

Q. Well, after he -- you saw him reach towards the right front of the van, what did you see next?

A. I don't recall.

Q. Okay. Well, after he reached, did he give you his license and registration?
A. Yes.
Q. Okay. And it was at that point that you asked for identification from the other passengers, correct?
A. I believe so.
Q. All right. Now, in your report, you reference in several places difficulty communicating?
A. Correct.
Q. Okay. Mr. Tamup is Hispanic, correct?
A. I -- I assume he is.
Q. All right. And the other individuals in the vehicle are of Hispanic decent, correct?
A. They appeared to be.
Q. And do you speak Spanish?
A. I do not.
Q. Okay. Now, before you ran the check on Mr. Tamup's license, you asked him a couple questions, didn't you?
A. I don't recall.
Q. All right. Well, do you recall asking him where he was going?
A. Yes.
Q. Okay. And did he answer you?

A. I don't recall if -- according to my report -- if I reference my report?
Q. Why don't we do it this way. I'll ask you and if you don't remember, I'll try to help you out. We'll go back to your report. Do you recall asking him where he was going?
A. Yes.
Q. All right. That's a standard question in a vehicle stop, correct?
A. Yes, it is.
Q. All right. And he responded to you, correct?
A. I believe he did.
Q. Okay. He told you he was going to Westerly, correct?
A. Yes.
Q. And you also asked him what the other -- where the other passengers were going, correct?
A. Yes.
Q. And he responded to that question, correct?
A. Yes.
Q. Okay. And do you recall what his response to that question was?
A. It was extremely difficult to understand Mr. Tamup. What I was able to gather from what he was telling me is that individuals in the van

were going to Westerly to polish jewelry. That's -- that's what I could understand of Mr. Tamup.

Q. Did you also understand that they were going to work?

A. Yes.

Q. All right. Why did you need identification from the passengers, Trooper?

A. Why do I need?

Q. Why did you?

A. I request identification from anybody in any vehicle that I've stopped since I got on the State Police.

Q. So it's your standard operating procedure to ask for ID from anyone who may be in a vehicle that you stop?

A. That is correct.

Q. Driver or passenger?

A. Both.

Q. Okay. Now, what is your policy, practice or procedure if passengers do not have some type of identification?

A. I interact, engage in conversation, attempt to obtain their name, their date of birth, their address, what they do for work, if they've been