arrested before.

Q. And this may be on a stop for something as incidental as the failure to use a turn signal?

MR. LEE: I'll object to the form of the question, "incidental."

MR. FORMISANO: I'll rephrase it.

Q. You would ask for identification from passengers when executing a run-of-the-mill traffic stop?

MR. LEE: Same objection to that form.

Q. You can go ahead.

MR. LEE: You can answer it, but I'm objecting to the form.

Q. Let me -- I can --

A. Actually, let me just -- I'll let you know.

Q. Yeah, sure.

A. Any vehicle that I stop is for a traffic violation. When I stop that vehicle and I approach the vehicle and I speak with the individual in charge of that vehicle, that being the operator, and I look into that vehicle, if there's 1 person or 15 people, I will ask every single person, to the best of my ability, for some type of identification.

Q. And if they don't have any identification, you ask follow-up questions?

A. That is correct.
Q. Okay. What if they refuse to answer those questions?
A. Then I go on my way. I move on.
Q. Well, did you ask -- strike that.
A number of the passengers in Mr. Tamup's van did not have identification, correct?
A. Correct.
Q. Okay. Did you ask the follow-up questions that you just referenced a moment ago of those passengers or to Mr. Tamup?
A. I attempted to.
Q. And what specific questions did you ask, sir?
A. As I stated earlier, I attempted to obtain their name, their date of birth, where they're coming from, where they're going to, any type of a criminal history just to verify who I have in the van there.
Q. So you attempted to elicit this information from Mr. Tamup as to the passengers?
A. Just because of the language barrier I couldn't converse with these people.
Q. I understand that.
A. Mr. Tamup obviously could.
Q. All right. So you attempted to elicit that

information as to the passengers from Mr. Tamup?
A. Correct.
Q. All right. And did you get any information as to the passengers? Strike that.
Did Mr. Tamup obtain any information that you were interested in getting from the passengers?
A. Other than a couple forms of ID from a couple of the passengers.
Q. And was this question and this exchange, this was occurring on the side of 95, correct?
A. Correct.
Q. And were you now on the passenger side of the van or the driver's side still?
A. I believe I was on the passenger side.
Q. According to your report, Trooper, you were interested in credentials proving U.S. citizenship?
A. That was following the questions of any type of identification.
Q. Well, again, is it your standard practice if someone does not have a license -- and I'm referring to passengers -- that you request documentation as to U.S. citizenship?
A. Not necessarily.
Q. Why did you ask these passengers for

documentation proving U.S. citizenship?
A. Because nobody had any identification on them whatsoever.
Q. Did you have a hunch that these individuals were not U.S. Citizens?
A. Yes.
Q. All right. Did you have a hunch that they were in the country illegally?
A. I suppose a hunch, yes.
Q. And what was the hunch based on, Trooper?
A. It is typically of any motor vehicle that I stop somebody in the vehicle can produce some sort of identification, an address of where they stay and credentials showing them to live wherever they say they do.
Q. Okay. At two points during the stop, you conducted a Terry patdown search, correct?
A. Correct.
Q. All right. And the Terry patdown search was conducted on Mr. Tamup, correct?
A. Correct.
Q. All right. According to your report, you conducted the first Terry patdown search after you sought identification from the passengers, correct?

A. I -- I don't know without reading the report, sir.

Q. Here's your report and it's right here in the third paragraph, Trooper. So you conducted a Terry patdown search after you asked for identification from the passengers, correct?

A. It appears that way.

Q. Okay. Why did you conduct a Terry patdown search on Mr. Tamup after you asked for identification from the passengers?

A. Just for my safety.

Q. Okay.

A. At that point, he was outside the van.

Q. All right. Well, what was it that gave rise to concern for your safety at this point?

A. I had 14 people in the van. And then once Mr. Tamup is in the van and he comes out of the van, I have no idea what he might have brought with him from the van, whether it be a knife, whether it be a weapon of some sort, so for my safety I conducted a Terry pat.

Q. Did you ask Mr. Tamup to assist you in obtaining information from the passengers?

A. Yes.

Q. Okay. And did you observe Mr. Tamup leave the

driver's seat of the van and come around to the passenger side of the van?
A. I believe I did.
Q. All right. Anything unusual occur as Mr. Tamup walked from the driver's side of the van to the passenger's side of the van?
A. No.
Q. And it was broad daylight when this stop occurred, correct?
A. Yes, it was daylight.
Q. Okay. Now, according to your report, when Mr. Tamup complied with your request and asked the passengers for identification, the passengers remained still and did not say a word; is that accurate?
A. Yes.
Q. All right. Now, why not leave it there, Trooper? If they didn't respond to your question, you said earlier your practice was that you'd just move on if people don't answer your questions. Why didn't you just move on that point, process the traffic violation and move on?
A. Because I feel as though I wouldn't be doing my job if I didn't investigate it a little further.

Q. And what other steps in your investigation followed after the passengers didn't respond to the request for identification?

A. I believe I went back to my cruiser at that time.

Q. You ran a check at this point on Mr. Tamup's license, correct?

A. Correct.

Q. And that check was negative, correct?

A. Correct.

Q. Now, is it your understanding that -- or belief that individuals who don't speak English must carry credentials proving citizenship?

A. Say that again.

Q. Is it your understanding that individuals who do not speak English must carry proof of citizenship?

A. No.

Q. All right. You were concerned, though, in this case, that these passengers did not have proof of citizenship, correct?

A. I was -- I was concerned with the fact that 99.9 percent of the people that I stop always have identification on them. And if not, it's extremely easy to tell whether the person is

telling me the truth of who they are or who they are not (sic).

Q. You ran the check on Mr. Tamup and then you contacted immigration and customs, correct?

A. Correct.

Q. And you informed the individual that you were speaking with at ICE that you believed you had illegal immigrants in a van, correct?

A. It appeared to be that way.

Q. And why did you believe that the passengers were illegal immigrants?

A. Just a hunch.

Q. Okay. Now, you then spoke with someone by the name of Burke, correct?

A. Correct.

Q. And what do you recall about your discussion with Agent Burke, Trooper?

A. I'd have to refer to my report.

Q. Okay. Did you review any documents before you came here today, sir?

A. Other than my incident report, no.

Q. When did you review your incident report?

A. I don't recall.

Q. All right. Well, in preparing for your deposition today, did you review your incident

report?
A. Yes.
Q. But you don't remember when you reviewed it?
A. Last night.
Q. Why don't you read the part that deals with the discussion with the agent. It's right here, sir. Maybe that will help your recollection.
(Witness complied.)
Q. Do you recall your discussion with Agent Burke, Trooper?
A. Yes.
Q. And what did you discuss with the agent?
A. I had a motor vehicle stop with numerous people inside the van and based on their lack of identification I had a hunch that maybe they were illegal immigrants.
Q. Okay. Now, after you spoke with Agent Burke, you returned to the van, correct?
A. I believe I did, yes.
Q. All right. And you conducted another Terry patdown on Mr. Tamup, correct?
A. I believe that's correct.
Q. Okay. And why did you conduct a second Terry patdown on Mr. Tamup, sir?
A. Because I allowed him to go back in the van

and then I asked him to step out of the van a second time.

Q. All right. So the justification for the second Terry patdown was what?

A. He could have picked up a weapon while he got back in his vehicle.

Q. Okay. Did you observe anything unusual between the time of the first Terry patdown and the second Terry patdown with respect to Mr. Tamup?

A. I couldn't see Mr. Tamup.

Q. Now, why did you contact ICE, Trooper?

A. I was acting on a hunch.

Q. All right. And when you have a hunch such as you had on the morning of July 11th with respect to individuals that may not be U.S. Citizens, is it your custom or practice to call ICE?

A. Well, I've never really encountered that before, but in this case, yes.

Q. All right. Was this the first time you'd contacted ICE after a traffic stop?

A. I believe it is.

Q. All right. Are you aware of other instances where the State Police have contacted ICE after a traffic stop?

A. I am.

Q. Were those instances similar to the incident that occurred on July 11th?

A. Extremely.

Q. So those were cases where individuals did not have proof of U.S. citizenship?

A. I wasn't on that stop. I can't answer that question.

Q. Well, you just said they were extremely similar, correct?

A. Extremely similar in the fact that a van was stopped, apparent paperwork could not be produced and that trooper decided to call ICE.

Q. Okay. Did that trooper have a hunch that the individuals in the van were in the country illegally?

A. You'd have to speak to that trooper.

Q. Who was that trooper?

A. I'm not sure who that trooper was.

Q. Other than this instance that you just referred to, are you aware of other instances where troopers have contacted ICE after stopping a vehicle and individuals of the vehicle did not have proof of U.S. citizenship?

A. Since my incident and following my incident, yes.

Q. All right. And tell me about that incident.
A. I'm not privy to all the information, so I -- I can't comment on it.
Q. Do you know who the troopers were that were involved in that incident?
A. Troopers from around the country.
Q. All right. How about in Rhode Island, are you aware of other instances in Rhode Island?
A. Since my incident?
Q. Yes.
A. Just one that I can think of.
Q. All right. And can you tell me the details of that stop?
A. I don't know the details of the stop.
Q. Is this the incident you just referred to?
A. I said that a van was stopped by a trooper.
Q. All right.
A. He, apparently, had the need to contact ICE at which time he did.
Q. All right.
A. That is all I know about the stop.
Q. All right. Now, after you spoke with Agent Burke and after you conducted the second Terry patdown search, you escorted Mr. Tamup and the passengers to Providence, correct?

A. I don't know the order of events, but, yes, that was following that, yes.
Q. And did you ask the passengers whether they were interested in going to the immigration office?
A. I did not ask the passengers directly, no.
Q. Did you ask Mr. Tamup if he and his passengers were interested in going to the immigration office?
A. I believe I did.
Q. Okay. Do you have a specific recollection of asking them that -- or asking Mr. Tamup that rather?
A. I do recall asking him that, yes.
Q. All right. So you asked Mr. Tamup if he and the passengers would agree to go to the immigration office, correct?
A. Correct.
Q. All right. And he indicated that they would go to the immigration office?
A. Apparently, he did.
Q. All right. Do you know whether he did or he didn't?
A. I have no idea. Apparently, he did and they agreed.
Q. All right. According to some of the

individuals -- I think it's all the individuals in the van -- you, through Mr. Tamup, threatened the individuals in the van. Do you have any idea why they would say that you threatened them?
A. I never ever threatened anybody in that van.
Q. They also claim that you made the statement that you would shoot them if they tried to escape?
A. That's absolutely false.
Q. At some point, did another State Trooper arrive at the scene?
A. Yes.
Q. Okay. And who was that?
A. I don't recall exactly what trooper you're referring to.
Q. Was there more than one?
A. On a stop troopers come by and they see that I have a motor vehicle stopped, so they'll stop by and see if I'm okay, and if I'm okay, they'll move on their way.
Q. Well, do you have any indication of the identity of any trooper that may have stopped during the course of this incident?
A. Yes.
Q. Okay. Who stopped at the scene while you were --
A. Trooper Donahue.

Q. And at what stage in the incident did Trooper Donahue arrive?

A. The very end of the incident.

Q. And when you say the "end," what do you mean by that?

A. I was waiting for Trooper Donahue at that point when we were going up to Providence.

Q. So he assisted you in escorting the van to Providence?

A. Correct.

Q. Tell me how you escorted the van to Providence, sir.

A. I was in front of the van and Trooper Donahue was behind the van.

Q. Okay. In the event the passengers and Mr. Tamup elected not to go to ICE, what was your plan?

A. Let them go.

Q. Now, in the package of documents you have in front of you, it's the last page, there's some handwritten notes and I just want to ask you a couple questions about that document.

What are these notes that are before you, sir?

A. Those are -- appears to be copies of videotapes --