# SUPPLEMENTAL EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ASTRID G. ESTRADA, WENDY M. ESTRADA, GUILFREDO E. MUNOZ, JOSE A. AQUINO, CRUZ F. RIVERA, CARLOS E. TAMUP, JOSE BURGOS, ABELINO M. URIZAR, ISRAEL TEBALAN, ROLANDO NORIEGA, BORIS R. CRUZ, and ELSA HERNANDEZ VILAVICENCIO,

vs. C.A. No. 07-10ML

STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARE, individually and in his official capacity as Superintendent of the Rhode Island State Police, THOMAS CHABOT, individually and in his official capacity as a state trooper employed by the State of Rhode Island, JANE DOE, individually and in her official capacity as a state trooper employed by the State of Rhode Island,

DEPOSITION OF THOMAS CHABOT, a witness in the above-entitled cause, taken on behalf of the Plaintiffs, before Devin J. Baccari, CSR, a Notary Public in and for the State of Rhode Island, at the Law Office of Sinapi, Formisano & Co., LTD., 100 Midway Place, Suite 1, Cranston, Rhode Island, on October 29, 2007 scheduled at 1:30 p.m.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

in-service training with regard to Terry stops and Terry patdowns?
A. I would say refresher, yes.
Q. Okay. And when was the last time you had a refresher in those areas?
A. I don't recall.
Q. All right. Within the last year?
A. I honestly don't recall.
Q. Would it have been the last few years?
A. Yes.
Q. All right. And do the State Police have a policy that has to do with racial profiling?
A. Yes.
Q. Okay. Have you had training with respect to that policy?
A. Yes.
Q. Okay. And when did that training occur, sir?
A. I don't recall the exact date.
Q. All right. Within the last year?
A. I don't recall.
Q. All right. What's your understanding, sir, of the grounds for conducting a Terry patdown?
A. It's for officer safety.
Q. Okay. What are the circumstances that justify a Terry patdown?

A. Make sure that I'm safe.
Q. So just so I understand your response, Trooper, a Terry patdown is justified if -- so you feel safe, is that what you're saying?
A. That's correct.
Q. All right. Is there anything else, in your mind, or do you understand that is a prerequisite to a Terry patdown search?
A. Yes.
Q. What?
A. Any type of movements within a vehicle.
Q. Anything else that you'd like to add to your response?
A. No.
Q. Is your response complete with respect to your understanding of the grounds that justify a Terry patdown?
A. Other than it's done for weapons.
Q. Okay. Anything else you'd like to add to your response?
A. No.
Q. Is your response complete?
A. Yes.
Q. Okay. On the July 11th -- let's jump to the incident now, Trooper -- you were on a patrol on

95 South, correct?
A. Yes, on July 11th. Yes.
Q. Okay. And is that an area you typically are assigned to?
A. Yes.
Q. All right. Does that area have a designated post name or a designation?
A. It's referred to the Hope Valley barracks.
Q. And is that where you were assigned in July of 2006?
A. Yes.
Q. All right. Have you always been assigned to the Hope Valley barracks?
A. No.
Q. Okay. When were you initially assigned to the Hope Valley barracks?
A. I don't recall the exact date.
Q. All right. Do you know the year?
A. Not exactly, no.
Q. Okay. Have you been down there for a few years?
A. Yes.
Q. Okay. And according to the report, the stop occurred at about 6:30 in the morning. What time did your shift begin on the 11th, sir?
A. It actually did not begin on the 11th. It

Q. Okay. Well, after he reached, did he give you his license and registration?
A. Yes.
Q. Okay. And it was at that point that you asked for identification from the other passengers, correct?
A. I believe so.
Q. All right. Now, in your report, you reference in several places difficulty communicating?
A. Correct.
Q. Okay. Mr. Tamup is Hispanic, correct?
A. I -- I assume he is.
Q. All right. And the other individuals in the vehicle are of Hispanic decent, correct?
A. They appeared to be.
Q. And do you speak Spanish?
A. I do not.
Q. Okay. Now, before you ran the check on Mr. Tamup's license, you asked him a couple questions, didn't you?
A. I don't recall.
Q. All right. Well, do you recall asking him where he was going?
A. Yes.
Q. Okay. And did he answer you?

A. I don't recall if -- according to my report -- if I reference my report?
Q. Why don't we do it this way. I'll ask you and if you don't remember, I'll try to help you out. We'll go back to your report. Do you recall asking him where he was going?
A. Yes.
Q. All right. That's a standard question in a vehicle stop, correct?
A. Yes, it is.
Q. All right. And he responded to you, correct?
A. I believe he did.
Q. Okay. He told you he was going to Westerly, correct?
A. Yes.
Q. And you also asked him what the other -- where the other passengers were going, correct?
A. Yes.
Q. And he responded to that question, correct?
A. Yes.
Q. Okay. And do you recall what his response to that question was?
A. It was extremely difficult to understand Mr. Tamup. What I was able to gather from what he was telling me is that individuals in the van

were going to Westerly to polish jewelry. That's -- that's what I could understand of Mr. Tamup.

Q. Did you also understand that they were going to work?

A. Yes.

Q. All right. Why did you need identification from the passengers, Trooper?

A. Why do I need?

Q. Why did you?

A. I request identification from anybody in any vehicle that I've stopped since I got on the State Police.

Q. So it's your standard operating procedure to ask for ID from anyone who may be in a vehicle that you stop?

A. That is correct.

Q. Driver or passenger?

A. Both.

Q. Okay. Now, what is your policy, practice or procedure if passengers do not have some type of identification?

A. I interact, engage in conversation, attempt to obtain their name, their date of birth, their address, what they do for work, if they've been

information as to the passengers from Mr. Tamup?
A. Correct.
Q. All right. And did you get any information as to the passengers? Strike that.
Did Mr. Tamup obtain any information that you were interested in getting from the passengers?
A. Other than a couple forms of ID from a couple of the passengers.
Q. And was this question and this exchange, this was occurring on the side of 95, correct?
A. Correct.
Q. And were you now on the passenger side of the van or the driver's side still?
A. I believe I was on the passenger side.
Q. According to your report, Trooper, you were interested in credentials proving U.S. citizenship?
A. That was following the questions of any type of identification.
Q. Well, again, is it your standard practice if someone does not have a license -- and I'm referring to passengers -- that you request documentation as to U.S. citizenship?
A. Not necessarily.
Q. Why did you ask these passengers for

documentation proving U.S. citizenship?
A. Because nobody had any identification on them whatsoever.
Q. Did you have a hunch that these individuals were not U.S. Citizens?
A. Yes.
Q. All right. Did you have a hunch that they were in the country illegally?
A. I suppose a hunch, yes.
Q. And what was the hunch based on, Trooper?
A. It is typically of any motor vehicle that I stop somebody in the vehicle can produce some sort of identification, an address of where they stay and credentials showing them to live wherever they say they do.
Q. Okay. At two points during the stop, you conducted a Terry patdown search, correct?
A. Correct.
Q. All right. And the Terry patdown search was conducted on Mr. Tamup, correct?
A. Correct.
Q. All right. According to your report, you conducted the first Terry patdown search after you sought identification from the passengers, correct?

A. I -- I don't know without reading the report, sir.

Q. Here's your report and it's right here in the third paragraph, Trooper. So you conducted a Terry patdown search after you asked for identification from the passengers, correct?

A. It appears that way.

Q. Okay. Why did you conduct a Terry patdown search on Mr. Tamup after you asked for identification from the passengers?

A. Just for my safety.

Q. Okay.

A. At that point, he was outside the van.

Q. All right. Well, what was it that gave rise to concern for your safety at this point?

A. I had 14 people in the van. And then once Mr. Tamup is in the van and he comes out of the van, I have no idea what he might have brought with him from the van, whether it be a knife, whether it be a weapon of some sort, so for my safety I conducted a Terry pat.

Q. Did you ask Mr. Tamup to assist you in obtaining information from the passengers?

A. Yes.

Q. Okay. And did you observe Mr. Tamup leave the

driver's seat of the van and come around to the passenger side of the van?
A. I believe I did.
Q. All right. Anything unusual occur as Mr. Tamup walked from the driver's side of the van to the passenger's side of the van?
A. No.
Q. And it was broad daylight when this stop occurred, correct?
A. Yes, it was daylight.
Q. Okay. Now, according to your report, when Mr. Tamup complied with your request and asked the passengers for identification, the passengers remained still and did not say a word; is that accurate?
A. Yes.
Q. All right. Now, why not leave it there, Trooper? If they didn't respond to your question, you said earlier your practice was that you'd just move on if people don't answer your questions. Why didn't you just move on that point, process the traffic violation and move on?
A. Because I feel as though I wouldn't be doing my job if I didn't investigate it a little further.

report?
A. Yes.
Q. But you don't remember when you reviewed it?
A. Last night.
Q. Why don't you read the part that deals with the discussion with the agent. It's right here, sir. Maybe that will help your recollection.
(Witness complied.)
Q. Do you recall your discussion with Agent Burke, Trooper?
A. Yes.
Q. And what did you discuss with the agent?
A. I had a motor vehicle stop with numerous people inside the van and based on their lack of identification I had a hunch that maybe they were illegal immigrants.
Q. Okay. Now, after you spoke with Agent Burke, you returned to the van, correct?
A. I believe I did, yes.
Q. All right. And you conducted another Terry patdown on Mr. Tamup, correct?
A. I believe that's correct.
Q. Okay. And why did you conduct a second Terry patdown on Mr. Tamup, sir?
A. Because I allowed him to go back in the van

and then I asked him to step out of the van a second time.
Q. All right. So the justification for the second Terry patdown was what?
A. He could have picked up a weapon while he got back in his vehicle.
Q. Okay. Did you observe anything unusual between the time of the first Terry patdown and the second Terry patdown with respect to Mr. Tamup?
A. I couldn't see Mr. Tamup.
Q. Now, why did you contact ICE, Trooper?
A. I was acting on a hunch.
Q. All right. And when you have a hunch such as you had on the morning of July 11th with respect to individuals that may not be U.S. Citizens, is it your custom or practice to call ICE?
A. Well, I've never really encountered that before, but in this case, yes.
Q. All right. Was this the first time you'd contacted ICE after a traffic stop?
A. I believe it is.
Q. All right. Are you aware of other instances where the State Police have contacted ICE after a traffic stop?
A. I am.

Q. Were those instances similar to the incident that occurred on July 11th?
A. Extremely.
Q. So those were cases where individuals did not have proof of U.S. citizenship?
A. I wasn't on that stop. I can't answer that question.
Q. Well, you just said they were extremely similar, correct?
A. Extremely similar in the fact that a van was stopped, apparent paperwork could not be produced and that trooper decided to call ICE.
Q. Okay. Did that trooper have a hunch that the individuals in the van were in the country illegally?
A. You'd have to speak to that trooper.
Q. Who was that trooper?
A. I'm not sure who that trooper was.
Q. Other than this instance that you just referred to, are you aware of other instances where troopers have contacted ICE after stopping a vehicle and individuals of the vehicle did not have proof of U.S. citizenship?
A. Since my incident and following my incident, yes.

Q. All right. And tell me about that incident.
A. I'm not privy to all the information, so I -- I can't comment on it.
Q. Do you know who the troopers were that were involved in that incident?
A. Troopers from around the country.
Q. All right. How about in Rhode Island, are you aware of other instances in Rhode Island?
A. Since my incident?
Q. Yes.
A. Just one that I can think of.
Q. All right. And can you tell me the details of that stop?
A. I don't know the details of the stop.
Q. Is this the incident you just referred to?
A. I said that a van was stopped by a trooper.
Q. All right.
A. He, apparently, had the need to contact ICE at which time he did.
Q. All right.
A. That is all I know about the stop.
Q. All right. Now, after you spoke with Agent Burke and after you conducted the second Terry patdown search, you escorted Mr. Tamup and the passengers to Providence, correct?

A. I don't know the order of events, but, yes, that was following that, yes.
Q. And did you ask the passengers whether they were interested in going to the immigration office?
A. I did not ask the passengers directly, no.
Q. Did you ask Mr. Tamup if he and his passengers were interested in going to the immigration office?
A. I believe I did.
Q. Okay. Do you have a specific recollection of asking them that -- or asking Mr. Tamup that rather?
A. I do recall asking him that, yes.
Q. All right. So you asked Mr. Tamup if he and the passengers would agree to go to the immigration office, correct?
A. Correct.
Q. All right. And he indicated that they would go to the immigration office?
A. Apparently, he did.
Q. All right. Do you know whether he did or he didn't?
A. I have no idea. Apparently, he did and they agreed.
Q. All right. According to some of the